The opinion of the court was delivered by
Tilghman, C. J.
James Hamilton, the elder, being seised in fee, of the land which-is the subject of this suit, devised it to his nephew, William Hamilton, for life, remainder to the first son of the said William, for life, remainder to that first and every other son and sons of the said first son of the said William, successively, according to priority of birth, in tail male, remainder to the second son of the said William Hamilton, for life, remainder to the first and every other son and sons of the said second son in tail male as aforesaid, remainder to the third, fourth, fifth, and .every other son and -sons of the said William Hamilton, successively for life, with remainder to their issue in tail male as aforesaid, remainder to the testator’s nephew Andrew Hamilton (elder brother of the said William Hamilton, and heir at law of the testator,) for life, with remainders to the first and every other son and sons of the said Andrew, for life, and remainders to their issues in tail male, successively, (precisely in the same manner as in the devises to the sons of the said William Hamilton,) remainder to the heirs of the body of, the said William Hamilton, remainder to the heirs of the body of the said Andrew Hamilton, remainder to the right heirs of the testator. The will was dated the 4th March, 1776, *327 and llie testator died in the year 1783, at which time, his nephews William, and Andrew, were both living, and also the said Andrew’s first son, James, and his second son' Andrew. Jln-drew Hamilton, the father, died before his brother William, leaving issue, two sons, James and Andrew, and four daughters. William Hamilton died without issue, having never been married. After his death, James Hamilton, (son of Andrew,) conveyed the land aforesaid, by deed of bargain and sale, to Doctor Thomas Parke in fee. To this deed, Andrew Hamilton, (son of Andrew) was a party, and the declared intent of it was, to make the said Thomas Parke, tenant to the prsecipe in a common recovery which was to be suffered for the purpose of vesting the fee simple In the said JáméS Hamilton. In pursuance of this intent, a common recovery was suffered in the Supreme court, at March Term, 1814, with treble voucher, in which James Lyle was demandant against the said Thomas Parke, tenant, and the said James and Andrew Hamilton, (sons oí Andrew) were severally vouched. On the 5th April, 1814, James Hamilton, conveyed one third of the premises to his brother Andrew in fee. On the 3d May, 1814, the said James and Andrew Hamilton (sons of Andrew) by their attorney, Thomas Cadwálader, conveyed a certain part of the premises, to Samuel Richards, the defendant, in fee, reserving a yearly ground rent of 280 dollars.' After the making of' this deed, the said James Hamilton died without issue, having never been married. The question for the consideration of the court is, whether upon the facts above stated, the last mentioned deed of James and Andrew Hamilton, vested a good estate in fee simple, in the said Samuel Richards. This will depend chiefly, upon the effect of the common recovery-before mentioned, and therefore it is necessary to consider, in the first place, of what estates, James and Andrew Hamilton (sons of Andrew) were seised at the time of thati recovery. ■ It appears, that James was seised of an estate for life', in possession, with contingent remainders to his sons successive!)’-, in tail male, and that Andrew had a vested remainder for life, withcontingent remainders to his sons successively, in tail male, after; which, a remainder in tail general was vested in Jamei, with remain-i der in fee simple vested in the said James and Andreio, and their'sisters. When I say that James Hamilton had a vested estate tail, I mean, vested in interest, not in possession. I incline to the opinion, that he took this interest by way of descent from his father, although, for the purpose of my argument, it is not material, whether it was so or not. For, however he took it, he had the whole estate tail in him, which would have descended from his father, supposing his father to have first taken it. James was heir ofthebodyof his father, Andrew, and the descentfrom him {James) to his issue, if he had issue, would have been precisely the same, whether he came to the estate by descent or by purchase. And although the estate tail was not vested in possession, it. was such an *328 interest as might be barred by a common recovery. I shall give no opinion, (because I think it unnecessary,) whether, previous to the suffering of the recovery, the estate for life of James Hamilton was merged in his estate tail general in remainder, or in the fee simple expectant on the estate tail which was vésted in him, (in interest,) in common with his brother and sisters, or whether the estate for life in Andrew, interposed between James’ estate for life, and his inheritance prevented the merger. The .effects of the common recovery will afford sufficient ground for deciding the present question, supposing the life estate of James not to have been previously merged. The recovery was well suffered. Doctor Parke was a good tenant to the praecipe, by virtue of the conveyance to him from James Hamilton, and the said James, and his brother Andrew, were regularly brought into court as vouchees. I think unnecessary also, to decide, whether the suffering of the recovery was, in itself, a forfeiture of the life estate of James Hamilton. That seems to' be a point not well settled, because, inasmuch as James Hamilton had in him an estate tail in remainder, and it is supposed by some, (and Coventry, in his Treatise on Recoveries, p. 53. thinks it the better opinion,) that he might rightfully suffer a recovery .for the purpose of barring that estate ‘tail* It is certain however, that one effect of the recovery was, the distribution of the • I,general estate tail vested in James Hamilton, and' inasmuch as a I James became seised of an estate in fee simple, in posssssion, in ■■ j-.conveyance of the recovery, it seems to me that his life estate was )} ¡.-gone. It was merged in that fee simple newly acquired, and, there h * being no son of James to enter, at the moment his life.estate ex- » \pired, the*cóhtingéñt remainders limited to his children, were de-V "strayed. It'was of rio importáncé whether the life estate of James ceased, by forfeiture or otherwise. Whenever a life estate becomes united with the inheritance, it is extinguished, ’ The less is mefgedln the greater.'Consequently, the life estate of James Hamilton being extinguished, and also the contingent remainders limited to his is-1 sue male, his brother Andrew, in whom an estate for life was vested, might have entered, if he had not been a party to the recovery. It appears also from the facts. in this case, that the life estate of James Hamilton was at an end, by his natural death, (independently of all considerations of the common recovery,) and he having left no issue, the contingent remainders to his son, were out of the question, and there would have been nothing to bar the entry of Andrew, who would have then an estate for life in possession, under the will of the testator, if he had not been party to the recovery. Then supposing the estate for life of Andrew (the son) / to be extinguished by the common recovery, all the contingent re-I mainders depending on it, full, and the estate tail in James being j barred by the same recovery, there was nothing to impeach the ? fee simple in James which was declared to be in him by the descent to lead the uses of the recovery. So that the decision of the *329 case now before the' court, depends, mainly, on the effect of the recovery on the estate of Andrew Hamilton, (son of Andrew.') If in consequence of his coming in as vouchee, his life estate was destroyed, the contingent remainders to his issue male, were likewise destroyed, because at that time he had no issue of either sex. In Coventry on Common Recoveries, 53, it is said, “that if a tenant for life, be vouched in a recovery, he will certainly lose his estate, for that would be a disclaimer on record. ” In support of this assertion, Sir Wm. Pelham’s Case, 1 Co.15, is cited, and comes up to the point. ■ It was there decided, that the tenant for life, who was vouched in the recovery suffered by Sir Wm. Pel-ham, lost his estate, and the immediate entry of the person who was seised of an estate tail in remainder, was lawful; the estate tail not being barred, because the- persons who suffered the recovery were not seised of the inheritance. On this principle, the life estate of Andrew Hamilton (son of Andrew) was destroyecfpfie- . cause Be was party to the deed from his brother «Tames and others, i ? f o'Doctor'PaAfe, in'which'the'uses of the' subsequent, common ,■ ? recovery 'were "declared, and in pursuance of that deed'he* ivasí i vouched; and became a p&íty io .the recovery. Tiffing .thyk- j not be a doubt, that his life estate was forfeited! He volunj^xgd | in thé'common recovery. 'For, he had no pretence, of an estate iail,‘lh remain’3er, to Bar, as his brother James had. He disclaimed the title under which he held his life estate, and set up another, adverse to it, which he warranted. What more could he do? In what manner could he more forcibly and efficaciously destroy the title under which he held, than by his disclaimer and warranty on record? Then, the life estate of Andreio Hamilton, being extin- ,. f guished, the contingent remainders dependent on it, were without ' support, and fell to the ground, and the general estate tail with the f fee simple, in remainder after it, having been barred by the recovery, : the estate in fee simple which was vested in James Hamilton by *. the said recovery, became indefeasible, and the title conveyed to ’ ■: the defendant by James and Andrew Hamilton, was good. But; it has been strenuously contended by the counsel for the defendant , that the principle of forfeiture by the act of a tenant for life, how- '*• ever firmly it may be established-in England, is not suitable to our institutions, and has never been adopted in Pennsylvaúia. Whether • the life estate of Andrew Hamilton was extinguished by forfeiture, or otherwise, is immaterial. . And I have no doubt, that in some way, either by his own conveyance and warranty on record, or byt estoppel, if not by forfeiture, it was extinguished. But it is of im- | * portance that it should be now decided, whether. the law of for-/^ feiture, applied to life estates on Which contingent remainders de-/ \ pend, exists in this commonwealth. PerhapsI might be excused from/ | doing any thing more on the present occasion, than referring to the - opinion delivered by me on this point in the case of Dunwoodie v. Reed, 3 Serg. Rawle, 435. But I think it better to make some ad *330 ditional remarks, because the court, which consisted but of two judges, when that case was decided, was divided in its opinion. Besides, fhe principle is of great and general concern, (ind we have had the advantage of a very able argument, in which every thing that could be said, on either side, was brought forward. The defendants first position is, that common recoveries have no force in this commonwealth, except what is derived from “ the act for barring estates tail,” passed 27th January, 1749 — 50; and inasmuch as this act gives them no other efficacy, than that of barring estates tail, they cannot work a forfeiture of an estate for life. In exanir ining this point, I will consider first, whether there be any thing in the nature of a common recovery unsuitable to the condition of the first settlers in Pennsylvania; second, whether in fact, it was used for the purpose of barring estates tail, before the act of 1750;. ihird, what has been the legal tradition on this subject
A common recovery is, in form, a real action founded on a rigKtasserted by the demandant and denied by the tenant. In that point of view, it is as proper for us, as any other real action., But a recpvery suffered by consent, has always been considered as a common conveyance ay,d assurance, and is pot to be compared tp .a jpdgment, or proceeding, in any other spit or action. Such is the language pf Chief Justice Wiples, in 1 Wils. 73, and such was the opinion of the Court of Kings’ Bench, as far back as, Lord Coke’s time, 1 Co. 15. This proceeding, applied to estates tail, answered a most beneficial purpose. The inconveniences pf those estates, Were felt, in England, long before a remedy was devised. . The House of Peers adhered to the statute de donis, because it protected their estates from forfeiture, and transmitted them, unincum-bered with debts, to the heir. It was vain, therefore, to expect relief from Parliament. In this situation, the matter stood, when the courts of justice encouraged the device of a common recovery, for the barring of estates tail, founded on a fiction, and not to be defended on any principle of sound reason. But it answered a good purpose, and the end justified the means. The law was as well settled, and the efficacy of common recoveries, in barring estates tail, was as notorious when the royal grant of Pennsylvania was made to William Penn, as any other part of the English law. Our ancestors, who came out, on the faith of the charter, brought with them the common law in general, although many of its principles lay dormant, until’ awakened by occasion. Some parts of the co.m-mon law, indeed, would have been altogether unsuitable to the spirit of the government about to be established in Pennsylvania, and therefore were never adopted But there was no inconvenience in holding real property by the same kind of estates as in England. Accordingly we hear of estates in fee simple, fee tail, for life, and for years, tenancy by the curtesy, and in dower, &c. &c. from the first settlement of the province. We hear also of the English modes of conveyance. Bargain and sale, lease and *331 release, grants, surrender, &c. &c. Fines and feoffments, are mentioned also, in several of our early acts of assembly, ás inodes of conveyance understood to be legal, although I believe there is no instance of their being actually used, till a much later period. The first record of a fine which I have been able to discover, is in the Court of Common Pleas of the county of Philadelphia, in the year 1752, {Say v. Phillemore.) There might have been a question whether it was expedient to introduce estates tail, into a country where the division of the estate among all the children, on the déath tif the parent, was a favourite principle. But, to adopt estates tail,- with all their incoveniences, and at the same time to reject the remedy for these inconveniences, would have been a defect''of judgment not to be attributed, without positive proof, to William Penn and his followers. If ever there was a country, in which common recoveries for the purpose of barring estates tail, were expedient, that country was Pennsylvania. This leads me to consider whether irt ■ fact, estates tail were barred by common recoveries before the act of 1750. Before I gave my opinion in the case of Bunwoodie v. Peed, I directed the records of the Supreme Court, and Court of Common Pleas of Philadelphia county, to be seardhed, and wasinformed, (as mentioned in .that opinión,) that one recovery had been suffered in thé Supreme Court, and five in the Court of Common Pleas; before the passing of the act for the barring of estates tail, (27th January, 1749 — 50.) As to the supposed recovery in the Supreme Court, there was a mistake. I have since examined the records Of that Court myself, and it appears, that the record of an indictment for á forcible entry, was püt, by accidentj into the box appropriated to common recoveries, and the clerk who made the search at my request, mistook it for a common fecovéry, and So reported it. I think it probable that there was a mistake also, as to the number, of recoveries reported to me as having been suffered in the Court of Common Pleas; siricé tile industry of the counsel Concerned in the present cause has discovered but three iijstead of five. The mistake however is not very material, as it still appears that at least three were suffered before the act of 1750. There may have been others, in the counties of Chester, Bucíés, ánd Lancaster, the records of which have not been searched. But as they do not appear, no argument can be drawn from any Conjecture con- . cerning them. The counsel %r the defendant concluded; that since no records have been produced, of common recoveries before the year 1744, and only three before making of the act of assembly in January, 1750, that mode of proceeding could not have been considered as legal, for if it had, there would have been no need of the act of assembly. And in further support of his opinion the counsel for 'the defendant relies on what is reported to have fallen from the mouth of Chief Justice Shiípen, in the Case of Morris’ Lessee v. Smith, 1 Yeates, 244. The Words are these: “ There was a time, within my remembrance, when lawyers held, that common *332 recoveries for docking estates tail, could not be legally suffered in Pennsylvania, and the first that was suffered will be found among the records of the Common Pleas, in my hand writing, when a young student. The practice however was not generally adopted till the passing of the act of assembly in 1750, which expressly au-thorised it.” I should be the last man to question the veracity, or the accuracy of Chief Justice Shippen, for whom I always entertained the most affectionate regard. But it would be going too far to conclude, from the expressions I have quoted, that common recoveries were not legal before the act of assembly. When Mr. Shippen wrote the proceedings in the recovery mentioned by him, he was a student in the office of Mr. Francis, and must have been about fifteen years of age. This was in the year 1745, when it is supposed, that Mr. Francis was the most eminent lawyer in Penn~ sylvania. At that time, then it could not with propriety have been said, to be held by lawyers, that a common recovery could not be legally suffered. But, no doubt, Mr. Shippen had heard, that in former times the legality of the practice had been questioned, and that may be considered, as the fair amount of his meaning. That however, by no means, proves the illegality of common recoveries. We may account for their not being introduced at an earlier period than 1745. It would be some time from the first settlement of the province, before much inconvenience could be felt from estates tail, and when it. was felt, if the estate tail was created by will, (theusual source of such estates,) our ancestors had a very simple way of getting over it, that is, by bringing an action against the executor of the person by whose will the entail was created, founded on some real or supposed debt due from the testator, and selling the entailed land by virtue of an execution on the judgment in that action. By this mode of proceeding, the purchaser under the execution came in of a title paramount the estate tail. But there is another reason why it was so long before either fines or common recoveries were brought into practice. From what I have been able to learn, of the early part of the history of Pennsylvania, it was a long time before she possessed lawyers of eminence. There were never wanting, men of strong minds, very well able to conduct the business of the courts without much regard to form. Such, in particular was Jlndrew Hamilton, the immediate predecessor of Mr. Francis, and the father of James Hamilton, the testator. But Mr. Francis appears to have been the first of our lawyers,. who mastered the technical difficulties of the profession. His precedents of pleadings have been handed down to the present day, and his Common Pleas book, which is in my possession, is an evidence of his great industry and accuracy. Having turned his attention to estates tail, he was of opinion, that they might be barred by common recoveries, and accordingly introduced them. His example was followed by Boss and M ‘Land, also eminent lawyers of that day, and the public attention'was thus *333 drawn to the subject. It was the anxious desire of the people;, that there should be some certain mode of barring estates tail. Although recoveries had been suffered, there were still doubts on the subject, and recoveries even though good, were attended with considerable expense. Petitions were presented to the legislature, and it is highly probable, that many of the petitioners wished for a law authorising the barring of estates tail by a common deed of conveyance. This had long been a favourite object, for we find that acts had been passed for that purpose, in 1705, and 1710, the last of which was repealed by the Queen in council, in 1713. See Galloways Ed. Laws, appen. p. 9., It was probably, their experience of the unwillingness of the Crown, to permit the barring of estates tail by a common deed, which induced the legislature in 1750, to confine, the mode of barring these estates to fine, and common recovery, to which it gave the same efficacy that they possessed in England. I consider this act of 1750, as no more than declaratory of the law which existed before. It removed all doubt, and. quieted the minds of the people on an important subject. To be sure, it is not called a declaratory act. But instances are numerous,. of acts, declaratory in their nature, though not so in name.
As to the suggestion, that, by the act of 1750, the operation of common recoveries was confined to the barring of estates tail, I can perceive no ground for it. The sole intent of the act, was to provide a certain mode for the barring of estates tail. It recites the inconveniences attending these estates, and then gives to fines, and common recoveries, the same efficacy in barring them', which they possessed in England. There it stops, there is not one word as to the operation of fines, or recoveries on any other subject. It might as. well be said, that the operation of fines was confined to estates tail. But that has not been pretended. That the operation of common recoveries was not confined to the barring of estates tail, in the opinion of the judges of this court, who reported to the legislature the British statutes in force within this commonwealth, may be clearly inferred, from their reporting the St at 14, Eliz. Ch. 8, as being in force, which was made for the avoiding of recoveries suffered by collusion, by tenants for term of life. It is clear, therefore, that if the operation of a common recovery would destroy the estate of tenant for life, by forfeiture, on common law' principles, there is nothing to gainsay it in the act of assembly. But it is contended also, that independently of the act of assembly, forfeiture is founded altogether on feudal principles, and therefore, ought not to be adopted in Pennsylvania. That argument would carry us too far. The principles of the feudal system are so interwoven with our jurisprudence, that there is no removing them without destroying the whole texture. When our ancestors claimed the benefit of the commonlaw, they took it as it was, except such parts as were manifestly unsuitable to their condition. Now, so far from any *334 thing unsuitable is there in the principle of forfeiture applied to the ease before us, that it appears to meto accord exactly with tlie spirit of our constitution. Pennsylvania has been always anxious to remove obstructions to the free alienation of lands. Contingent remainders are a great obstruction to free alienation; of which, nothing can afford a stronger proof than the situation of the Hamilton estate. Had the intention of the testator been carried into full effect,the progress of the city,of Philadelphia would'have been arrested for half a century, and perhaps much longer, in a very interesting quarter, and for what purposé ? Certainly for no other than the gratification of family pride. This is a feeling which every man has a right to indulge, within the limits of the law. But no man has a right to say, that all principles which tend to restrain his inclination, are unreasonable, and unfit for the country. It cannot be denied, that the suffering of a common recovery, by tenant for life, works a forféitúfé of his estate by the common law, and consequently, destroys all remainders, which at the moment of forfeiture,^ rest'in' contingency ‘ It lies upon those'then, wKo deny the ' existence of the law of forfeiture in Pennsylvania, to prove it. I do not perceive, that any such proof has been given. The case of M‘Kee’s Les. v. Pfout, 3 Dall. 486, has been relied on. The question in that case was, whether a conveyance in fee by tenant b'Jf the curtesy, by deed of bargain and sale, recorded according to the act of assembly, “for aknowledging and recording of deeds,” passed in the year 1715, was a forfeiture of the estate. The argument in favour of forfeiture was founded on that part of the act, which declares that “such deeds shall be of the same'force and effect'here, for the giving possession and seisin, and making good the title and assurances of lands, tenements, and hereditaments, as deeds of feoffment, zoith livery of seisin, or deeds inrolled in any of the courts of record in Westminster, are, or shall be, in the kingdom of Great Britain.”. It was decided that there was no forfeiture, because it was not the iñtention of the act to work a forfeiture. These are the expressions of C. J. M‘Kean : Siiippen,' J. was of the same opinion. He says, “ that in allowing to deeds recorded, the same force and effect its feoffments with livery, the' intention of the act is expressly restricted to giving possession and seisin, and making good the title and assurances of lands.” The reasons assigned by these judges are quite satisfactory. Independently of the act of assembly, a deed of bargain and sale did not work a forfeiture. But it was the intention of the act to facilitate the mode of conveyance by bargain and sale, and not to create a forfeiture. Therefore, it shall not be so construed as to create a forfeiture. What would be the effect of a feoffment with livery, is another question, and I give no opinion on it. It is a kind of conveyance out of use; indeed, I have never heard of one in Pennsylvania. But common recoveries have .been in great use. The counsel for the plaintiff have furnished us with lists of 33 in the *335 Supreme Court, from the year 1763 to 1796, and 175 in the Common Pleas of the county oí Philadelphia, from September, 1750, to December, 1798. Of these they suppose that at least seven were for the purpose of destroying contingent remainders. But this is a point not easily ascertained. What words make a contingent remainder, it is very often difficult to decide. Many recoveries may have been intended to bar estates tail, and yet in fact, may have destroy-éd contingent remainders. So that there is no knowing the extent of the mischief which may be done, by deciding now, that a common recovery was not a forfeiture of an estate for life. I have taken pains to ascertian the opinion of the bar, transmitted to us by tradition, from the year 1750. And on that point I have no doubt. A tradition of this kind must naturally be looked for in this city, where in 1750, and long afterwards, the principal lawyers resided. I have often heard the subject mentioned by those who are now no more, but never heard the forfeiture doubted. I will mention one fact, which goes far, in showing the opinion of the pld lawyers. I know from good authority, that Mr. Chew, who was chief justice at the time of the revolution, gave to the testator James Hamilton, the draught of a will, or part of a will, in which was inserted a clause, Appointing trustees for supporting contingent remainders. Mr. Hamilton, not understanding the necessity of this proyision, omitted it, and hence arises the present dispute. We may see then, that in Mr. Chew’s opinion, the support of trustees was necessary.,! Now, I have been informed, that he studied the law under the first ndrew Hamilton, and we know that Mr. Francis succeeded Mr. Hamilton, and Mr. Chew succeeded Mr. Francis, in the office of Attorney General, and in professional eminence. So that I think we have pretty good evidence of the opinion of this bar, from about the year 1750 to 1776. When we are inquiring whether a certain mode of conveyance, usual in England, was formerly introduced in Pennsylvania, it is very much a matter of fact, anda fact which must have been within the knowledge of professional men. So that, in the absence of positive proof, great regard is due to the general understanding of the profession. In this point of view, there is great weight in the opinion of the late Mr. Edward Tilghman, under whose direction, the common recovery now in question’was .suffered. His legal abilities are well known to the gentlemen of this bar, but the circumstance which attaches peculiar importance to his opinion in this casé is, that he was in the practice of the law in the year 1774, and in habits of familiar acquaintance with the lawyers of that day, several of whom were at the bar in the year 1750. It is worthy of remark, that in the case of M‘Kee v. Pfout, mentioned before, where the counsel for the plaintiff argued against the forfeiture, it was taken for granted by them, that a feoffment with livery, would have occasioned a forfeiture, nor did any intimation to the contrary fall from the court. Now, certainly a feoffment with livery, could not. have *336 , more force that) a common recovery. The late Judge Yeates, in his opinion in the case of Findlay’s Lessee v. Riddle, 3 Binn. 154, 'says, “ that contingent remainders may be preserved from being defeated before they come in use;” meaning as I apprehend, that they might be defeated in the usual manner, by such a conveyance, or assurance as would incur a forfeiture of the estate for life, and that they might be preserved by the appointment of trustees, for the purpose of entering in case'of forfeiture, and holding as long as the remainder was in contingency. For my own part, having given to this interesting subject, all the consideration which it merits, I have been led to the conclusion, that the common law doctrine of forfeiture, for the purpose of barring contingent, remainders, is congenial to the spirit of our constitution, and therefore, in principle, it ought to be extended, as in fact, it has been extended to the state of Pennsylvania. And upon the whole of this case, I am of opinion, th.at the common recovery vested in James Hamilton, the younger, an estate in fee simple, in the premises, so as to enable him to grant one third thereof to his brother Andrew, in fee, and to enable them both to convey a good estate in fee to- Samuel Richards the defendant,
Gibson, J.
When the recovery was suffered, the existing interests under the will stood thus: An estate for life in James, vested in possession, with successive contingent remainders in tail male to his first and other sons: an estate for life in Andrew, vested in interest, with successive contingent remainders in tail male to his first and other sons: remainder in tail to James, either vested or contingent: reversion in fee, to the right heirs of the testator. It is argued by counsel, that the remainder in tail to James, is contingent; and if that be so, it disposes of the point, that the preceding contingent remainders limited to the sons of Andrew were barred by the union of the several vested parts of the fee in James; and this, on the ground of there being no estate tail in existence which could be the subject of a common recovery: which would reduce the controversy to the question agitated in Dumvoody v. Reed, whether a recovery can, for any purpose, have an effect, except as an instrument in' barring an estate tail. With respect to that, I hold the same opinion now, which I did then, and shall say something further with respect to it, in the sequel. But I see no reason to doubt, that the estate tail limited to the heirs of Andrew, the father of James and Andrew, and the nephew of the testator, was vested at all events, at the death of Andrew the father. It is unnecessary to inquire whéther the words by which an inheritable estate is devised to his heirs, are to be taken as words of limitation by reason of the 'devise of a prior freehold estate to himself (although I incline ter think they ought;) because it is clear, that at his death, his son James, answering the description in the devise, took an immediate vested interest under it, either by descent or purchase: which is sufficient for the purpose of the argument. The suggestion, that *337 if Andrew the father never took an interest in this estate tail, and It be considered as having for the first time vested in his son James, Andrew the brother of James could never inherit from him, and that to let him in, there would have to be successive estates tail limited to the sons of Andrew the father, is plausible but without foundation. Mandeville’s case, 1 Inst. 26, is exactly in point, and proves that Andrew might take; and whether by descent from the ancestor although he had nothing, or by purchase as answering the description in the devise, is immaterial. The matter is discussed in a note in Fearne on Remainders, 82, where the law is considered to be settled, although on principles which are not easily discoverable. Then as there was a vested estate tail to be barred, the common recovery was consequently a proper form of conveyance even under my construction of the, act of 1750, and had the effect of enlarging the estate tail to a fee, and of uniting it with the estate for life of James under the deed to lead the uses. This even without any participation by Andrew would leave only his estate for life outstanding; and the question is whether his joining In the covenants in the deed to lead the uses, and suffering himself to be vouched without counterpleading the warranty, and vouching over the common vouchee, destroys his estate in favour of James, under the deed to lead the uses: and I have no doubt that it does. Where a common recovery is a legal mode of conveyance, whatever may be thought of the construction of the act of Assembly in other respects, it must necessarily have all its common law effects, on the estates of those who join in it. It is therefore unnecessary! to inquire whether Andrew’s estate passed by surrender, release, » ] or in any other manner: it was clearly extinguished by his war-j 1 ranty, which estops him from ever claiming it: for all are estop-1. f ped by. a recovery who cannot falsify it, whether they come in as; I vouchees or were originally parties. Pells v. Brown, Cro. Jac. 592. It is impossible therefore to avoid the conclusion that-Andrew’s estate was barred; and if so, James’s life estate being merged in the fee, which could be prevented only by the existence, ; of Andrew’s estate, the contingent remainders limited to the sons V of Atidrew, are gone. If there had not been a vested estate tail : - in the way, the same union of the existing vested parts of the fee,' might have been produced by any form of conveyance either under the statute of uses, or at the common law, but as there was such an estate tail, the only form of conveyance which could produce such a union, (I do not speak of a deed acknowledged in court under our act of Assembly,) was a common recovery. The effect of this union in barring contingent remainders is so explicitly stated and so clearly explained by Mr. Fearne as to preclude any attempt to render it clearer. .
On the question whether common recoveries were originally broughthereby our ancestors asa part of the common law, or were introduced for aspecial purpose by the act of 1750, Ihave already expres- *338 ed my opinion in Dunwoody v. Reed; and as I have discovered nothing in the argument hereto shake my confidence-in that opinion, but on the contrary, much to confirm'me in it, I shall state the reasons that weigh with me, somewhat more at length than I did in the case just alluded to.
A position has been taken by counsel, which, in its full extent, Í think no one will concede; that on the arrival of our ancestors'in the province, the whole common law of England was cast on them, as an inheritance is cast on the heir, without power on their part to prevent its descending on them; the whole or particular parts to be ' entered on and occupied in actual use, as occasion might from time to time require. It is undoubtedly true as a general rule, subject however to exceptions, that the first settlers of a colony carry with them the laws and usages of the mother country: nor did this rule require the sanction attempted to be given to it in the sixth section of the charter to William Penn, which declared that the laws for regulating property and punishing felonies should be and continue in Pennsylvania, the same as they should be, for the time being, by the general course of the law in England; until they should be altered by Mr. Penn, and the freemen of the province. This provision was merely .directory or declaratory of a general principle which existed before. But to a greater or less extent, there necessarily exists in every country a species of legislation by the people themselves, which in' England and in this country is the foundation of the common law itself, or in other words general custom obtaining by common consent: and this sort of legislation will be more freely used in the infancy of a colony, where an abrupt change of the circumstances and condition of the colonists must require a correspondent alteration of the laws and usages of the mother country to fit them to actual use,than ina country whose jurisprudence has been the gradual product of time and experience. In the infancy of this colony it produced not only a modification of some of the rules of the common law, but a total rejection of many of the rest. In Carson v Blazer, 2 Binney, 484, it is said by Judge Yeates, whose personal experience extended half a century back, and who was well skilled in the earlier traditions of the province, that the uniform idea had been that only such parts of the common law as were applicable to the local situation of the colonists were received by them, and in that case it was held by the whole court that the common law distinction with respect to rivers that are navigable and those which " are not, is inapplicable in this state. And in Stoever v. Whitman, 6 Binn. 420, it was declared by Chief Justice TilghmaN, '; in delivering the opinion of the court,thattheruleof the common law ‘ which renders seisin in the grantor necessary to the validity of a ^conveyance of land, was never adopted here. So, there is no 'law in Pennsylvania by which the property in goods is divested from the true owner by a sale in market overt. Hossack v. Weaver, 1 Yeates, 478, Hardy v. Metzgar, 2 Yeates, 347, Easton v. *339 Worthington, 5 Serg. & Rawle, 130. On theground of at least a modification of a rule of the common law rest the right of a tenant to the way going crop; the power of a husband to affect his wife’s right of dower by judgment or mortgage; and the right of a sheriff who has levied household furniture to suffer it to remain in the possession of the debtor without impairing the lien of the execution. I will add only one instance more which at present occurs to me. At the last term for the western district, it was held by this court in Little v. Gordon, 3 Sergt. & Rawle, 533,thatthecommonlawrule of responsibility of common carriers, is inapplicable to carrying for hire on-our fresh water l’ivers; although it is admitted to govern in cases of carrying by land. Now this was not a recognition of a new law but of the common consent of the country in opposition to the alleged existence of an old one., I do not say that non user alone ought to be considered as conclusive evidence of .universal assent, for we have a modern instance of assize of nuisance having been maintained; dormit aliquando lex, mor Hum nunquam; but where to a clear and unqualified non user for more than half a century, we find subjoined positive acts of the whole community evincing a disclaimer of the existence of a particular law, it ought to be conclusive: for it is not to be credited that a law can be in force, and its existence, at the same time be a secret to' every member of the community, whether lettered or layman. Now what is the evidence here? The most diligent search has not produced a single precedent of a common recovery from the settlement of the province down to the year 1744. If this part of the inheritance was oast on our ancestors, why did they not enter on it, and use it? Had they no wants to satisfy? We shall see. As early as 1705, and probably much 'earlier, entails had become common, and the mischiefs arising from them had begun to be felt; for in that year the general assembly passed án act for barring entails by any deed proved or acknowledged and recorded: a mode something like the one they adopted shortly after they became their own masters, and which is in force at this day. This law was repealed, it Would seem by the Queen in council. In 1710, the necessity of having some means of avoiding the pernicious consequences of perpetuities, induced the assembly again to press the matter on the attention of the crown, and a new act containing a similar provision was passed, presented, and rejected by the Queen and council. Whether these acts suggested to Sir William Blackstone the propriety of abolishing common recoveries even in England, which he recommends in.his commentaries, vol. 2, page 361,1 will not pretend to say. But under the accumulating evils of perpetuities the forbearance of the assembly and of the people for forty years afterwards, to have recourse to common recoveries, is, to my mind satisfactory evidence of a determination that they were not and should not be in force in the province. It establishes beyond controversy the truth of Chief Justice Sbipeen’s assertion, that there was a tiipe when there was *340 but one opinion on the subject. It is unnecessary to seek for the foundation of this opinion; whether it rested on a supposition that the courts had not jurisdiction of real actions, oi; that this sort of assurance was not adapted to the habits and circumstances of the ' people, it is sufficient that it prevailed and was entertained by the legislature, the bench, the. bar, and the people. No one, however . who has attended to the legal history of the province can help seeing that it arose from an utter repugnance to this part of the common (law. In the laws agreed on in England we find the colonists ex-plessly stipulating for' the right of appearing and defending their causes in person, and exacting as a fundamental condition, “that all pleadings, processes, and records in courts shall be short and in English, and in an ordinary and plain character, that they may he understood, and justice speedily administered.” 1 Dall. Laws, app. 22. But this distaste to form was not confined to proceedings in the courts. By an act passed in 1683, it was declared, “that for avoiding long and tedious conveyances and the many contentions which may arise about the variety of estates, all grants of estates shall be either of the inheritance; or for lives; or for years, any number not exceeding fifty years; which grants shall be thus contracted in these words:'” and then follows a form of conveyance, which, as it is short, and discloses the temper of the times better than any observations of mine could do, I shall give word for word. “A. B. the-day of-in the year according to the English account- from him, his heirs and assigns, grants his (here describe the bounds) with all its appurtenances, lying in the' county of-containing-acres or thereabouts, to C. D. and his heirs (if in fee) or to E. F. for his life, (if for life) or to G. H. for one hundred years if J. K.: L. M.: N. 0. shall so long live, or to P. Q. for fifty' years, for the consideration of-pounds in money paid, andof the yearly rent to be paid tó A. B. In witness whereof he sets his hand and seal. Sealed and delivered in the presence óf R.S.T. Acknowledged in open court, and certified under the clerk’s hand and seal, the —— day of-and registered the-day of-Now with this aversion to the intricacy and technical obscurity of conveyances under the statute of uses, or even at the common law, I think it will be conceded the colonists must have bad a perfect horror of common recoveries with their vouchers to warranty, their refcompense in value, their conveyances to make a tenant to the praecipe, their deeds to lead or declare uses; and many other matters which are as purely technical, and, even to professional men as difficult of comprehension as any other part of the law. It was Said With great truth by Chief Justice Willes in delivering the opinion of the court in Murtin v. Strachan, 1 Wils. 73, that Mr. ' JPiggott as able a conveyancer as any man of the profession, had confounded himself and every body else who read his book, by en-deavouring to give reasons for common recoveries; and that when men do so, they run into absurdities, and the .whole of what they *341 say is unintelligible jargon and learned nonsense. In latter days this attempt is abandoned, and the ablest lawyers say a common recovery is only a formal mode of conveyance by which a tenant in tail is able to convey afee simple. 3 Com. 36. The truth is these feigned recoveries, although not only-defensible, but under the circumstances of the times, highly meritorious when restrained to the objects for which they were devised, were originally a meré juggle to elude the operation of the statute de donis; but as the courts attributed to them most of, if not all, the properties of recoveries on title, and consequently permitted them to be made the instruments of barring other estates than entails, or at least of turning them to a right, they were, in this respect, insufferably mischievous. If, then, it be true, as is said in the books, that our an-s cestors brought with them only such parts of the common law as , suited their peculiar circumstances, they undoubtedly left this part of it behind them. There were at an early day very few lawyers in the province, and if we judge from the loose practice and imperfect manner of making up judicial records which they have entailed on us, the best of these few unskilled in the forms, whatever may have been their knowledge of the principles, of the law. Fear therefore for the security of titles, from blunders in the manner of conducting the proceeding, would naturally induce the people to reject this mode of conveyance. The popular feeling must naturally have found its way into the general assembly; and we accordingly find it was not till after .forty years from the last of their attempts to establish a mode of their own, and after it was rendered certain that nothing better could be obtained that the legislature consented to adopt this method of barring entails, which was forced upon them by the necessities of the people and the obstinacy of the crown. Three recoveries with or without law, had been actually suffered within the space of six years; petitions from several counties were presented — some of them reciting these recoveries and stating that the people were in doubt and apprehension as to the title — others averring that there existed no effectual mode of barring entails — but all concurring in a prayer that something might be done, 4 vol. of votes of assembly, p. 99: and the legislature, fear- , ful, as it seems to me, that the practice having taken root, might ! grow into a law, and recoveries if left to themselves, have all their > common law consequences of divesting vested estates; of creating! forfeitures, and thereby defeating contingent ones; of creating tor- 1 tious estates in fee simple in those who before had no pretence of ‘ right — objects for which they were originally not designed — and of thus making havoc of the estates of innocent men, not parties to them; adopted and established common recoveries as a mode of i assurance,Tut specially and purposely confined their operations to [ the barring of entails. !
IF then recoveries were newly introduced by the act of 1750, and not as a part of the common-law, the consequence is inevitable that *342 \ for all other purposes than the barring of entails, they are altogether / inoperativei"eitlTéf"diféctly or in d ire ctly j andthat 'when' suHereclliy j a lenant for life/ they“We Tn”uhmeanmg ‘eérémbnyj'producingño í legal results. The three"cases of recoveñes'súfferéddunñ'g'the'"Six *y‘é¡hfs"i‘iíitfíédiately preceding the act, all of which were advised by Mr. Francis, an able lawyer, and by two other gentlemen, whose opinions are not entitled to the same weight, ought not to be considered as having settled the lavtq because it had been previously settled in a different way by the universal acquiescence and assent of the people during a period of seventy years. I readily admit, that ,if no act of assembly had been passed on the subject, the practice would have been continued on the footing of themommon law, because the necessities of the country were irresistible; and as by this'time, a countless number of titles would have depended on it, the courts would have been precluded from inquiring whether in its origin it were right or wrong: the maxim of communis error, would have been applicable to it with conclusive force. But the • legislature taking the matter up on the foot of the practice as it then stood, had a right to lay their hands on it, and while it was yet in the gristle, to bend it and mould it at their pleasure. That they thought they were introducing recoveries for the first time, and not enacting a declaratory- law, is clear, not only from-the particular expressions which they used, but from the fact of their having thought it necessary to render previous recoveries valid by a special provision; which would have been altogether unnecessary if the object had been to declare that common recoveries had all along been in force by virtue of the common law. I am aware that a declaratory statute, made in the affirmative, without negative words express or implied, does not take away those parts of the common law which are not particularly recognized by the statute; and consequently, that the latter'should be construed as it was before the recognition by the legislature, Co. Lit. 115 a. note 8 and 9. But this rule holds only as to statutes avowedly predicating the existence of the common law. I grant if common recoveries had been in force here for all purposes, this act containing only affirmative words would not have the effect of restraining, their operation to the barring of entails: but the very question is, were they so in force? No.w, if that were even doubtful, what ought the constructtion to have been if this question had presented itself immediately after the passing of the act? I shall hereafter inquire whether subsequent circumstances call for a different construction now?
That the actual intention of the legislature was to restrain recoveries to the barring of entails, I flatter myself, I have shown from the history of their introduction. But there are other considerations which ought to induce us to lean to any construction that would produce that result. Since the Stat. 14, Eliz. c. 8, the only ground , on which a recovery suffered by a bare tenant for life in favour of ' a stranger, is a bar of a contingent remainder, is that such reco *343 very is a forfeiture of his estate in favour of him who has the next vested remainder. At the common law, a recovery against a tenant for life with voucher on a true warranty and recovery in value, bound even a vested remainder, because, as it is said, the particular estate and the remainder are in contemplation of law but one estate; and as one warranty may extend to both, the recompense in value shall extend to- both: and a recovery not on a true warranty,' but by covin, if it did not bar him in remainder, would at least toll his right of entry: which was prétty near the same thing, as the, prosecution of a real action was a troublesome and expensive matter. Jenning’s Case, 10 Sep. 43. But since the 14 Eliz., and indeed, since the 32 H. 8 c. 31, which the 14 Eliz. has repealed and supplied, a recovery by covin is altogether void against him in remainder; but as it is a common assurance, it was held in Pelham’s Case, 1 Rep. 15, to be a breach of allegiance which the tenant owed to his feodal superior, and therefore, a forfeiture of his estate. This notion of forfeiture enables the courts to elude one half of the intention of the legislature, which was to protect all remainders whether contingent or vested; and to perpetuate in a different form, a part of the very mischief intended to be remedied. By the way, it is remarkable how often the narrow views of the courts have defeated very beneficial acts of the legislature. Of this the statute of uses, the statutes of limitations, and the statute of frauds, the first of which was substantially repealed by the common law courts, and very important parts of the last, nearly so by the Court of Chancery, furnish striking instances. So it happened in some measure with this statute of 14 Eliz. Now this principle of forfeiture as affecting other interests than those of the party, is adverse to the habits and feelings of our country, and irreconcileable to the spirit and principles of our civil institutions. The constitution of the United States declares that no attainder of treason shall work corruption of blood, or forfeiture, except during the life of the person attainted; and the constitution of Pennsylvania, besides containing the same provision, declares that the estates- of those persons who shall destroy their own lives shall descend, or vest as in case of natural death, and that there shall be no forfeiture by reáson of any killing by casualty. These two provisions, peculiar to our state constitution, are by no means modern,' but were taken from the charter of privileges, granted in 1701 by William Penn. I certainly do not pretend that the present is a question of political law, depending on any provision of the constitution; but I cite these passages to show what has all along been the tone of our most eminent jurists, with respect to forfeiture: which in a doubtful case, ought to have weight. The sentiments of Mr. Penn, the founder, and in some respects the law giver, of the province, have a direct and legitimate operation on the question before us. The only exception is to be found in Evans’s Lessee v. Davis, 1 Yeates, 332, where, although the point was not directly decided, *344 it seems to have been supposed both by the counsel and the court, that forfeiture of the particular estate by treason, would bar a contingent remainder. As I am perfectly sure that no opinion of mine can shake the authority of an opinion of the very able judge who presided, and those who were associated with him, I may without fear, that a doubt expressed by me will, a second time, give rise to a law suit, take leave to say, that if the point were now before this court, I should' even on common law principles, come to a different conclusion: By the attainder, the particular estate was neither extinguished, nor altered in quantity, but existed, after it was vested in the commonwealth, exactly in the plight in which it was held by the tenant; and this was admitted on all hands: for the commonwealth could not have pretended that she held any other interest than the old estate, or by any other title than that of the tenant, or that the particular estate was determined by escheat. The doctrine of forfeiture for crimes, is not of feodal origin, but existed before the conquest, as á part of the Saxon law, although escheat was after-wards added to it, so as to operate in attainders of felony, not of treason, after the forfeiture to the crown for a year and a day had been satisfied; and then the land fell to the immediate lord of the fee fur want of inheritable blood, 2 Com. 215. Now the attainder in Evans’s Lessee v. Davis, operated only on the individual interest of the person attainted; and if his estate had been annihilated, .there would have been nothing in the commonwealth to prevent the person having the next vested remainder, from immediately entering. But there is a manifest difference between a forfeiture which operates as an assignment of the parties interested to a third person, and a forfeiture to the remainderman for an act done in dissaffirmance of his estate, which operates by way of extinguishment of the particular estate, and enables the remainderman to .enter into the immediate enjoyment of his estate. The law is clear, that wherever the particular estate remains in specie, and unaltered in quantity, let it be in the hands of whom it may,' it will support a contingent remainder. Fearne, 1 Am. Ed. 338. And therefore a conveyance of tenant for life by bargain and sale, or by lease and release, destroys no contingent remainder; for it passes only what he may lawfully grant, ib. 321-2. Now, the act of attainder in Evans’s Lessee v. Davis, did ho more; and unless there be magic in the word forfeiture, it is difficult to see a difference between a direct grant to the commonwealth, and the doing of an act which transfers exactly the same estate to her by operation of law. So a severance between joint tenants, or a release by the one to the other, is not such an ■alteration of the particular estate as will bar a contingent remainder, because it is an alteration in quality, and not in quantity: the interest in that respect remaining unchanged, ib. 338 — 9. But a feoffment in fee, or the suffering of a recovery, creates a forfeiture which does operate by way of extinguishment, and gives the next remainderman an immediate right to enter, on the exercise of which *345 the contingent remainder is gone. The court seem to have beeri carried away by. the word forfeiture, without considering that it is not, in any ease, the abstract effect of the forfeiture; but the actual entry of the person next in remainder, in cdnSéquence of it; which defeats the contingent remainder. Thus the acceptance of a fine come ceo from a stranger, although a forfeiture, will bar no remainder, if the contingency happen before entry, ib. 349, And if tenant for life makes a feoffment, on condition; which is broken; and he enters on the feoffee before the contingency happens, thé-Contingent remainder will still be supported, unless theperson entitled to the next vested, remainder has entered fór the forfeiture', ib. 349. Thus we sée it is the vesting in actual possession of an estate, which although prior in time as to vesting in interest, was posterior in time as to the order Of enjoyment, and not the forfeiture per se, which bars á contingent remainder. This is, in fact; the root of a principle which extends as well to cases of merger ás of forfeiture; for where a remainder in foe or the reversion; is subjoined to the particular estate, they form but one estate; and the tenant having been in possession of the particular estate; is in possession of the whole, and consequently, in possession of an estate pósr terior to the contingent estate; and a possession already cómménce'd cannot be displaced .to make room, for an estate which adcrued subsequently by thé happenihg of a Contingency. So it is with respect to an entry for a forfeiture. I Should, therefore, conclude, thatif the remainder in Evans’ lessee v. Davis haA been contingent; it would have been preserved, notwithstanding the forfeiture of the particular estate. If the point made by the counsel, and apparently acquiesced in by thé court, and the counsel on the other side; could be sustained, we might, considering the frequency of forfeitures in England, éxpect to find some British authority for it; but there is none. Sir Thomas Palmer’s case; Noy. 2d2, S. C. Moore, 815, pl. 1103, cited by coühselfroni 13 Pin. Forfeiture; C. pl. 12; and recognized as law, by Justice YeateS, was this: A. Covenanted to stand seiSed to the use df himself for life; remainder to B. fof life; remainder to the first, second, and other sons of B; remainder to the right heirs of A. Á. is attainted df treason; and held that all' his sons born after the attainder were barred; and that the king should have the fee discharged. There is no reason givén for the decision; and Mr. Fearne remarks, that whatever effect the forfeiture of A’s. estate for life, and remainder in fee, might otherwise be supposed to have, there was a vested freehold in B. capable of, supporting the contingent remainders to his sons; and that it is impossible to reconcile the decision to the settled principles of the law, without supposing cm office, antecedent to the birth df a son of B. finding a fee in A.: in which case, the right df entry even of B. would have been gone. Perhaps the triie reásdd is, it was a Star’ Chamber decision, between a subject and the royal treasury. IJóweVe& in Corbet v. Tichborn, 2 Salk, 576, a case, in all its circumstances, *346 like Sir Thomas Palmer’s, it was held the contingent remainders were not barred; because of the freehold estate in B. The case is briefly and unsatisfactorily reported: but we ought not to be led to a conclusion, that the forfeiture of A’s. estate for life alone, would have defeated the remainders, if there had not been an estate for life in B. on which they might depend; but as there was a forfeiture both of A’s. estate for life, and remainder in fee, the particular estate would, but for the intervening of B’s. estate for life, have merged in the fee; and the remainders would have been barred on that ground: whereas, the intervening of B’s. estate, kept the life estate of it, and the remainder in fee asunder; and the contingent remainders might, therefore, safely depend on the freehold of B. Where, however, there has been a general office finding a fee in the person attainted, although falsely, the crown acquires a fee which can be avoided only by a traverse; and in the mean time, even vested remainders are turned to a bare, right; the office producing, in this respect, the same consequences that were produced by a common recovery, suffered by' tenant for life, before the Stdt. 14 Eliz., and barring a contingent remainder in the same way, by .enlarging the particular estate to a fee. But where the office is special, and finds the facts truly; or where the act of attainder operates only on the interest which the party attainted had, the particular estate is not enlarged in the possession of the king, and a person entitled to a vested remainder may, therefore, enter on him at the expiration of such particular estate. Layton v. Manlove, Salk. 469: and it is difficult to assign a reason why a person who is entitled to a contingent remainder which hasjvested by the happening of the contingency before that time, may not also enter. The sole reason \ why a particular estate is necessary to support a contingent remain- ¡ der, is that a freehold estate cannot be created to commence infu- \ tero; and therefore, there must be livery, of seisin to pass the remainder out of the grantor when the particular estate passes; the seisin of the particular tenant- enuring to, and becoming the seisin i of, the remainder man. If there has been such livery and seisin t at the creation of the particular estate it is sufficient, and no act of ; the particular tenant, whether of forfeiture or conveyance, vesting ■ his particular estate in the commonwealth and no more, can make a difference; for if the forfeiture should produce a chasm between , the particular estate and the remainder, on the notion that the es- . tate acquired by the commonwealth, was a distinct interest, and not a continuation of the seisin and estate of the particular tenant, it •; would on feudal principles, which require that some person should always be actually seised to render the services, be a discontinu- . anee, and divest a remainder which was before vested in interest: which it clearly cannot do. Mr. Fearne observes, page 308, that ; there are some few instances-of vested remainders taking effect, al- ,; though the preceding estate be defeated; but in all those instances ' the legal seisin of the remainder-man was protected, because, the *347 estate fell back to the grantor, who was in actual possession, and enabled to perform the feudal services: which would not be the case if a forfeiture to the commonwealth created in-her a new and dis-tinctestate. Ihavedwelt longer on this case of Evans’ lessee v. Davis, than its direct bearing on the question before us, may seem to require; but there is something gained if I can show that the only instance in Pennsylvania, iñ which forfeiture of the particular estate, has been viewed with complacency as a bar to contingent remainder, is in that respect altogether irreconcilable to the principles even of the common law. But it is to be observed, that the remainder was so clearly vested, that neither the court nor the counsel seem, to have given this point much attention. And what is of some consequence, we may also observe, in the act of attainder which gave rise to the question, a remarkable degree of care in the legislature, in restraining its operation exclusively to the particular interest of the party attainted: which Is in accordance with the spirit of all our provisions on the subject, and furnishes a presumption of intention, with respect to other laws which otherwise might by construction be extended to affect the interest of third persons.
Then if the doctrine of forfeiture has not already been rivetted on us, its palpable injustice, should make us struggle to cast it off. In what light it is viewed by Courts of Equity, we all know. When trustees, to support contingent remainders join in a common recovery, chancery punishes them; and the only reason why that court will not punish a tenant for life, for his own benefit, is> that there being no trust in the case, it has no jurisdiction; aud the act for that reason alone, is left to its legal consequences. It is, however, remarked by Mr. Butler, Co. Lit. 290, b. n. 1, that titles depending on such an act, can never be recommended;; and the power of tenant for life to destroy contingent remainders being strictissimi juris, can never expect favour, or any thing beyond mere support. And we are told, that a late learned Chief Justice of the King’s Bench, Lord Kenyon, brought a bill into parliament to remedy this very grievance. After this, ea.n we doubt that if even the English common law courts were furnished, with a plausible pretext for ridding themselves of the consequences of forfeiture without disturbing titles, they would not gladly lay hold of it?
To the abstract injustice of destroying these contingent interests, is opposed the policy of unfettering estates; which it is said conduces to the welfare of society, particularly in a republic; and we have heard much of the bad tendency of perpetuities in general, and of the aristocratic notions of Mr. Hamilton, the testator, in par- , ticular. In this, as in every thing else, extremes are dangerous. ! There is a wide difference between restraint on alienation for a sin- j gle descent, and restraint till a whole race shall become extinct. : The great objection to entails without the means of barring them,1 arises from political considerations; the accumulation of property1 *348 io a particular family for ages having a direct tendency to give a preponderance to the aristocracy of wealth and talents, which in a greater or less degree \yili exist under every form of government: in this country, it might in time be dangerous to our civil institu-. Rons. No sucia danger, however can arise from restraint on alienation for one generation; fpr the next operation of the intestate acts, will break the estate into fragments, small enough to allay all apprehensions. on that score: and as. to any impulse to exertion in the acquirement of property by throwing off restraint in the transmission pf it; or of increasing its capacity for usefulness by enabling the possessor to make improvements without risque of losing the the capital invested: that would be more than counterbalanced by permitting every man in possession of an inheritance to have the absolute controul of the fee. I cannot discover the. wisdom of that policy which would forbi.d a father from making a prudent provision for his extravagant and dissolute son, without at-tlm same time giving him power to rob his own unborn children. But the question is not whether this may be done, the law declares it may, but whether it shall be done only by the observance of this or that ceremony. There are but too many instance of improvident sons ip republics as well as in monarchies who require provision for their own lives, and are at the same time unfit to have the absolute con-troul of their patrimony. The exercise of unlimited controul over their estates by men just come of age, has a direct tendency tp make them spendthrifts or something worse; and is certainly not the best calculated to increase the public stock of morality. With respect to industry as affected by this sort of restraint, there will always be a sufficient number of unfettered estates to.inyigorate individual exertion to acquii’e them; and as regards the public interest in the progress of improvement, there will not be another instance picked out of ten thousand, of one of these fettered estates being Situated in the edge of a populous city: and even in this very instance, the experiment has terminated in disappointment and heavy losses, while the improvements are already in a state of dilapidation.
If then such ought to have been the decision of this point, bad it arisen'immediately after the passing of the act of 175Ó; are there subsequent circumstances which require us to give it a different construction now? That it has not been settled by judicial decision is conceded. .But i,t is supposed' that the report of the judges of this court on the subject of British statutes in force here, which includes the 14 Eliz., is an indirect recognition of the doctrine that recoveries are to be considered as existing here by the common law: because if a recovery suffered by a tenant for life were an absolute nullity, that statute would be altogether useless, I am not going to say a word against that report, or that its accuracy ought to be questioned. On the contrary, it is an able performance, settling many questions of extreme perplexity, and therefore, as a standard, *349 invaluable in practice. As to all matters which it professes to decide, I think it should be considered conclusive, on. the ground that it is a report pursuant to a legislative reference of matters of extreme doubt, the main object of which was to obtain certainty; and I am content that the statute of 14 Eliz. shall be considered as in force here: it can do no harm. But I cannot go to the same length in respect to matters of mere inference. Who will say'there is not a wide difference between a report of this kind, compiled at short intervals during the recess of the immediate duties of the judges, and a solemn decision with the aid of an elaborate argument by ■ counsel, and the fruit of their research? Or who will say that the point under consideration was in the view of the judges at all? They knew.that recoveries existed here in fact; and it would not in like circumstances, occur to one man in a thousand to inquire whether thejf existed with all their common law properties, or modified by the act of assembly. To suppose that such an inquiry would present itself, is to suppose that the law of recoveries with its whole range of consequences in all their relations, would also present itself: a thing not to be credited. But on a general view, the statute might seem a wholesome provision, and therefore applicable to our actual condition; but this report is not evidence that . it had been extended here by actual practice in particular instances, j j or that a common recovery was ever suffered in Pennsylvania with i j a view to divest a remainder, or to bar a contingent one; or indeed! | for any other purpose than to bar an entail. If there was an in- > j stance before 1750, where is the record? If since, we might ex-j \( pect not only the record, but some trace .of it in Mr. Dallas’s re-b ports, or in the manuscripts ofMr. Justice Yeates, oneofthe judges who made the report, and who is known to have been a diligent note taker and curious observer of every thing rare and uncommon in the law. All the research of counsel has led to but one instance where the estate to be barred might be mistaken for a contingent remainder. In fixing on particular statutes supposed to be in force here, the judges could, in few instances, be guided by a knowledge of their having actually been recognized in practice. As to many of them (and this among the number) usage was not to be expected; for the simplicity of the manners and customs of the colonists would render it unnecessary for them them to resort to laws-adapted to a state of society entirely different, where the artificial distinctions of rank had introduced more complex limitations of property, to provide for the younger branches of families according to the various contingencies that might happen before the estate should fall into possession. The judges must, therefore, have frequently been governed by their view of what might be a wholesome application of English statutes to our actual condition, without havingaseertained, with the greatest precision the state of the law in those respects which were supposed to render such application necessary. The including'of the statute 14 Eliz. in the report, when fairly consid *350 'ered, cannot, therefore, go for more than the inference of an'opinion of able lawyers, whose attention had not been particularly directed to the point. Whether the question was argued before the late President Hamilton in Dunwoodie v.Meed and before President Wilson in' Ratten v. Cornish, on .the ground on which it has been argued here, and what degree of investigation it received, I know not. At most the decision- in these two cases can be estimated but as the opinion of two very respectable lawyers, and as such it ought to go for what, it is worth: but these cases, and the report of the judges, alone furnish any thing like the expression of ■judicial opinion on the subject. With respect to the opinion'of the bar generally, or of those members of it whose opinions are peculiarly entitled to deference, it is impossible for any one to speak even with a moderate degree of certainty, as the matter has been but very recently drawn into controversy: but I must here take occasion to assert, that from the weight of the opinion of the late Mr. Tilghman, as collected from his having advised the common recovery in this case, and with which I was embarrassed in Dunwoodie v. Reed, the argument is entirely relieved; for it is altogether increbible that a gentleman so profound in every branch of law, and so peculiarly au fait in this, should have disowned the very ground on which we all concur on holding the recovery to be a bar of the contingent remainders. But the abstract opinion of counsel, although doubtless entitled to great respect, ought not to be considered decisive, unless where they have been so far acted upon as to produce such a number of titles depending on them as would render it highly inconvenient to depart from them; and this leads to an inquiry with which I shall conclude this opinion already drawn to an inconvenient length; how far titles would be affected by establishing the doctrine I advocate.
I think it may be safely asserted,, that no case can be found, even including the present, where a common recovery was suffered with a view of barring a contingent remainder on the ground of the recovery being a forfeiture of the particular estate. In all the instances produced, except one, in which the title has been examined, the interest intended to be barred, I take it to be conceded, was an estate tail. In the case of captain Cooper’s will the nature of the estate is doubtful. In Dunwoodie v. Reed, it is well known that the recovery was suffered under a belief that the tenant was seised in tail. Whence then the danger to titles? If there were at an early day, a few cases of contingent retnainders depending on an estate for life, where recoveries were suffered on a supposition that the tenants were seised in tail; these would be protected by the statute of limitations: and if there should be a few modern cases of the kind, I see no reason why a principle on which the parties did not rely at the time, should be called up for their protection. There may in fact be just as many cases of the sort where deeds have been acknowledged pursuant to the act of 1799, with a view to bar entails, *351 and where there was no estate tail in the case, but an estate for life with a contingent remainder depending on it; and yet in Findlay v. Riddle, that never entered into the head of the court, as a reason why such proceeding should be a bar. In the very case before us, nothing would be lost by protecting the contingent remainder if the question turned on this point, for the Hamilton family would get the property back with the improvements, after having received its value thrice told. A court should make large sacrifices of principles to convenience, where a great number of titles would be unsettled by the decision of a question in a particular way; but we should have a motley system of patchwork indeed, if the principles of the law were to be wrested or bent to obviate every inconvenience that may be felt in a single case, or even in a few cases. Even courts of equity are governed by general rules which are sometimes inadequate to the doing of exact justice in particular cases. There can be no rule for the application of the argument ab inconvenienti; but every court must in that respect be governed by a sound discretion, on a view of the whole ground; and here I discern no consequences from-the doctrine I advocate, calculated to create alarm. I am therefore of opinion that there are no circumstances subsequent to the act of 1750, which require that it should now receive a different construction from what it ought originally to have received.
Although this opinion may be received as a legal heresy by the ! profession, particularly in this city, I do not regret having expres- ¡ sed it; and having stated the reasons which forced my judgment to adopt it, I leave it to its fate. At the worst however it will not I; hope be thought to spring from sentiments of hostility to the English common law. No freeman would hesitate to prefer the hardy features of personal independence of this most excellent system of jurisprudence, notwithstanding the subtlety of its forms and the tediousness of its administration, to the civil law, the code of continental Europe, under which justice may be unceremoniously snatched by the hand of power. It is one of the noblest properties of this common law, that instead of moulding the habits, the manners and the transactions of mankind to inflexible rules, it adapts itself to the business and circumstances of the times, and keeps pace with the improvements of the age. There are undoubtedly principles of remote antiquity which are foundation stones, and cannot be removed without destroying the beautiful. and commodious modern edifice erected on them. But common: recoveries are not a foundation stone. They were no part of the original plan; but were introduced and not very skilfully managed to repair an injury from a violent innovation by the legislature. In this state they have been sucessfully separated from the structure, and might be entirely dispensed with: but as to a certain extent they undoubtedly exist, with their rotten parts cut away, I am for allowing thgprgsaetly the effect which it seems to me the legislature *352 intended they should have, the effect of barring estates tail, and no further. '
Duncan, «T.
The case stated presented to the view of the court one single, abstract proposition; and that was, did a common recovery suffered after the passage of the act of 1749 — 50, by tenant for life, with contingent remainders in tail, destroy these remainders? The doubt ai’ose from the division of this court in Dunwoodie v. Reed; in which I did not sit, being of counsel in the cause. I will proceed to consider the case as if it still depended on that proposition; and then consider it with relation to other views which have been taken of the will of the testator, the nature of the estate devised, the state of the family when the recovery was suffered, and the acts of James and Andrew Hamilton subsequent to thfe recovery. — Did not the divided state of the court impose on me the indispensable duty, I would have declined giving any opinion, because of my concern, as counsel, in bunwoodie v. Reed, and because I held the obligation of the party against whose claim the decision was, for a fee depending on its successful result; which had not been abandoned, though it had not been renewed by suit. The obligation I had cancelled, to relieve my mind from any sordid consideration; and I trust I have brought it unbiassed to the decision. At least I haye honestly endeavoured to extinguish every former impression; and from the result of a very patient and laborious examination, my only apprehension is, that instead of producing a bias in favour of a claim I had much at heart, that circumstance may have produced a bearing against it: and from the peculiarity of my situation, deciding, as I may say, alone, on property of immense value in the cause, but deciding likewise a principle which involves a great mass of property held by others on a similar title, whom we understand, and whom we see, anxiously waiting the event of the cause; and settling a general principle as to the nature of tenures, affecting the whole landed interest of the state, placed in the conflict of opinions, between the Chief Justice and my Brother Gibson, (whose opinion I unfeignedly respect,) and where I must differ from one of them, in the state of sole arbiter, I feel most sensibly the duty I have to perform. But my burden has been greatly lightened and my task smoothed, by the very ftdl and able discussion of the counsel on both sides; who have omitted nothing that could shed light on the question, and have pressed every topic on the attention of the court, with a strength of argument that instructed, and an ingenuity that charmed and elevated. They have drawn from the darkness, in which it was buried, into light, much of the early legislative history of Pennsylvania, on the reception of the common law, as the basis of our tenures, and much of its judicial history. It would be a work of labour and of difficulty, for any judge to state what parts of the common law the colonists did bring with them. Some parts of the common law and cr 'A'.itutes o? .England wove, novev used here; iiorao oí both *353 laws were supplied, modified, and altered by legislative acts; and some were rejected in use, as inconsistent with the policy of a newly settled country. Those which the silent legislation of the people abrogated by desuetude, as well as those which were altered and repealed by the actual legislation of their delegates, have not any binding force.
Our present inquiry is more confined: Was the doctrine of entails, with all its incidents, remainders vested, contingent, and cross, with all their appendages, and all the English statutes regulating executory devises, and shifting uses, of later origin, the rule in Shelly’s case, with all its deductions and consequences; the rule that inheritances cannot ascend, because like lead, must descend, because, as Lord Coke gravely observes, — the father and mother are not of the bi<5od of their child, but the uncle and aunt are, — are all those received, introduced, and adopted? Were all the grants of lands in free and common socage, according to the common and statute laws of England? If these things be so, then did our ancestors bring with them the bane, entail; so little suited to their condition, so repugnant to their whole scheme of government, and so inconsistent with the simplicity of their private manners, and leave behind them the antidote, common recovery.
Has perpetuity, which in England has been denounced as born under an unfortunate planet, as too aristocratic for their monarchy, found a refuge in this land of freedom ? It would be strange if this were so. But it. is not so. In my humble judgment, entailment was agreeable to the usage of Pennsylvania from its first settlement. This is proven by laws, by records, and by facts. The only circumstance from which a difficulty could be made, is an act of assembly of "the 11th March, 1683, entitled “Forms of Estates of Inheritance, or for life, lives, or years.” This act gives a short and simple form of conveyance for estates of inheritance to the grantee, his heirs and assigns; and declares, that for avoiding long and tedious conveyances, and the many controversies that may arise about variety of estates, all grants of estates shall be either of inheritance, or for life or lives, or for years, not exceeding fifty. 1 Dall. St. L. Appendix, 27. This appears like a putting down of estates tail by grants, — but does not touch devises. Nor does it appear how long it continued in force. It certainly was not in force in 1705: a very striking proof of the opinion of the first settlers, how inconsistent restraints on alienation were with the policy of our infant settlement. It would be some time before any thing could be found, respecting estates tail in the first generation. They would not be often questioned, nor would there be frequent occasion to use common recoveries, — nor perhaps among the first settlers were lawyers found competent to prepare the apparatus and machinery to conduct them. From what we have seen of the judicial proceedings among .the first settlers, there would not appear to have been one expert ia *354 the law, nor would any of that profession be considered as a desirable acquisition among friends, in the early days of the settlement; nor would he have found the practice a very profitable one. It is remarkable, that at so early a period we should find legislative recognition of estates tail; and that the recognition of common recoveries and of estates tail should be coeval. The act of 1705, for better settling estates, (Weiss’s Ed. 1st vol. 25,) only regu- ■ lates the descent of lands where the father died seised, and might dispose of them by will. It left estates tail, and all other cases of descents, as they were at the common law; and an elder brother by that act succeeded to the estate of his younger brother, who died intestate of full age, unmarried, in preference to other brothers and sisters. Lessee of Sauder and others v. Morningstar, 1 Yeates, 313.
The case was one of descent of entailed lands, and the court observed that it was now too late to stir the point, whatever reason there might be before for a contrary rule in the first instance, that the invariable opinion of lawyers — since the act of 1705 — had been, that entailed lands descended according to the course of the common law, that it had been understood generally, that it had been so decided at an early day, that all the common recoveries had been conformable to this principle; and to unsettle so many titles at that day would be productive of endless confusion. This was a decision at nisi prius by Chief Justice M'Kean and Mr. Justice Yeates, judges of great experience. Indeed Judge Yeates possessed more knowdedge of the usages in the country, than has fallen to the lot of any other man; and it is a very notable coincidence that this act, which left estates tail to descend secun-dum formam doni, was passed at the very same session that an act passed, putting it in the power of tenant in tail, by any deed, or conveyance acknowledged and recorded to dock and bar estates tail, and enacts, “That such deeds and conveyances should be of the same force and effect here, as fines and recoveries at common law, or deeds of feoffment, with livery of seisin, or deeds recorded, in any of the courts at Westminster.” 1 Dall. St. L. Appendix, 39. There are three observations taken by the editor from some early edition of the laws, subjoined in a note. 1st. This act continued in force for eleven years. By the minutes of assembly of 2d of 11th month, 1710, it appears, it was then repealed, and an order made.for bringing in a new bill to amend the former. 2d Observation. Deeds made1 in pursuance of the act, whilst in force are sufficient bars to estates tail. 3d Observation. On the 20th of 12ih month, 1710, a new act was passed, in which there is a clause of the same import with this act, which act continued in forcé until the 20th of 12th month, 17J3; when it was repealed by order of the Queen in council. It would be unaccountable, when we find the provincial legislature so anxious to avoid perpetual entails, and *355 loosen restraints on alienation, that they should leave the owner without any mode to accomplish an end so much desired, from 1713 to 1750, — 37 years.
This anxious legislature is far from discovering a design to abrogate the common law recovery. It confirms its existence and use, it provides a more expeditious and less expensive instrument; and instead of the cumbrous and complex machine then in use, common recovery, gives to the people an opportunity of using a common household implement, which the meanest capacity could comprehend, and the most common scrivener prepare, leaving to such as chose it, the common recovery as it stood, which many now use instead of the conveyance of the act of 1799; considering that in some cases it might accomplish something unattainable by that mode. Of the effect of the conveyance under the act of 1799, in not creating a forfeiture of a life estate, and destroying contingent remainders, I give no opinions at present. I neither assent to, nor dissent from the dictum of the Chief Justice in Dunwoodie v. Reed. That the affirmative act of 1705 implied a negative of the common law, or that the act of 1749 — 50 impaired its effect in any respect, I am far-from granting. As well might it be contended, that the act of 1799, giving a new remedy to tenants in tail, took away the common law recovery, and its recognition in the act of 1749 — 50. This is not only contrary to the general understanding, but is directly in the teeth of the report of the judges of this court, on the British statutes to be incorporated into our laws. The act of 1705, and 1799, give different remedies: the act of 1749 gave the same remedy. But if it were even a different one, still the common law recovery would be in full force, and a party would be at liberty to use one or the other as pleased himself. It requires negative words to take away a common law remedy, or a common law right; or provisions so inconsistent with the previous law, as to manifest the clear intention of the legislature. Let us illustrate this by one or two examples: The compulsory arbitration act gives a new form of writ, on contracts verbal or written: it gives a form of statement, as a substitute for the common law declaration. But this provision does not take away the common law writ, and the common law declaration. The samé act, whose object was, as the title shows, "to regulate proceedings in courts of justice,” gives a new form of writ in ejectment, but it provides that all writs of ejectment shall be in the form following, and,not otherwise. In the first case, it has been decided, that notwithstanding this provision, the defendant may pursue the old form of action if he thinks proper, and is not debarred of the action of debt. Miles v. O‘Hara, 1 Serg. & Rawle, 32. Yet in ejectments the new-prescribed form must be pursued Mr. Wharton in his very valuable work, has arranged this case very properly under the head of Actions. Tit. Election of dictions, Whart. Dig. 3.' But this is no new doctrine. It is an obvious principle in the construction of statutes, that they are never pre *356 sumed to make an alteration in the common law, further than as the statute declares; and where there is a right at common law and the statute takes away that right, it is to'be construed strictly, and is not to go beyond its very words. 1 Dall. 66. 11 Mod. 149. 10 Johns. 579. For in all general matters, the law does not presume any alteration intended by the act further than is expressed. Hence it is, that the intestate acts, though in their provisions very general, do not comprehend estates tail. In one of the first editions of the acts of assembly, there is a note to the charter to William Penn, observing, that although it should be made a question whether the statute laws of England did not extend to this province by the charter, yet as the common law is generally allowed to be in force in such cases, where no alterations have been made by act of assembly, and it appears to have been resolved in the Earl of Derby’s case, 4. Inst. 284, that lands granted by letters patent from the Crown, though out of the realm of England, should descend according to the course of the common law, (1 Dall. St. L. Appendix, 261,) so lands in Pennsylvania descend according to the same course. Even in penal statutes this construction obtains; for, where a statute creates a new offence, and points out a particular punishment, and a specific mode of recovering the penalty which it inflicts, that particular method must be pursued: but where the act was an-tecedently punishable by a common law proceeding, and the statute prescribes a particular remedy by _ a summary proceeding, there either method may be pursued; and the prosecutor is at liberty either to proceed at the common law, or in the method prescribed by the statute; because there the action is cumulative, and does not preclude the common law. The King v. Robinson, 2 Burr. 799. In the act for “regulating proceedings in courts of justice/’ before referred to, the legislature provided, “that in all cases where a remedy is provided, or duty enjoined, or any thing directed to be done by any act of assembly, the directions of the acts shall be strictly pursued, and no penalty shall be inflicted, or any thing done agreeably to the provisions of the common law, in such cases, further than is necessary to carry the act into effect.” Here is a recognition of 'cumulative, statutory, and common law remedies. This act has been considered not to touch civil actions, or remedies for civil rights, and is confined to penal inflictions merely. In American legislation, when a term of the common law is adopted, the common law meaning is adopted with it. To know what the common law was before the making of such statute, is the very lock and key to open its windows, and it is always considered the best interpretation of statutes, to construe them as near the reason and rule of the common law as may be. Common recovery is above all others a term of art, has a technical signification; and even in the construction of the constitution of the United States, this rule prevails with relation to terms of art, and that even in the highest offence, — treason. The question on the trial of Colonel Burr, 4 *357 Cranch, Appendix, was on the meaning of the term, levying war. Chief Justice Marshall observed, “It is not for the first time applied to treason by the constitution of the United States. It is a technical term: it is used in a very old statute in that country, whose language is our language, and whose laws form the substratum of our laws. It is scarcely conceivable, that the term was not employed by the framers of our constitution, in the sense which had been affixed to it by those from whom we borrowed it. So far as the meaning of any terms, particularly terms of art, is completely ascertained, those by who'm they are employed must be considered as employing them in that ascertained meaning, unless the contrary be proved by the context.” The act of 1749 gives to common recoveries not only their common law effect, but all their effect under the statute law; that is, the statute of Elizabeth and other statutes declaring covenous recoveries by tenants for life void.' That act likewise makes them void. There was the same law of entailment, the statute de donis in full force here, the same mode of destruction, by an instrument of the same name, with a declaration that whatever effect it should have in the,mother country it should have here, whose common law was our common law, guaranteed to William-Penn, and his followers, by the charter, insisted upon by the representatives of the people as their birthright; not considered a badge of slavery or a yoke of oppression, but the palladium of their privileges and charter of their rights. And this position judges must treasure up in their minds; because, when called upon to decide questions of meum and tuum, it is their only sure guide. All lands in Pennsylvania are held in free and common socage, and thus socage tenure is, still resorted to in the nomination of guardians. The Orphans’ Court in their appointments are confined to guardians in socage, or by' nurture. Graham’s Appeal, 1 Dall. 136.
The soil was granted to William Penn in free and common socage. It was so held by him, so parcelled out to. his followers, and so granted by him and his successors, as will appear by every patent issued anterior to the revolution. It was an inherent principle in all new settlements, that the laws of the mother country, not inconsistent with the circumstances and situation of the infant colony, should have a binding force until altered by the new government; and that binding force arises from a necessity, which supposes that they received the laws under which they lived, before their settlement in the new plantations, and agreed to be governed by them, for want of another law. See 2 Smith’s Laws, 106, in his very' interesting article on the land laws of Pennsylvania. Now no one will pretend, that a law avoiding restraints on alienation of lands was inconsistent with their state; though all will agree, that the restraint itself was inconsistent. But this did not rest on the compact between the founder and his followers: it was incorporated in the royal charter. “ The laws for regulating and go *358 verning property, as well for the descent and enjoyment of lands, as the succession and enjoyment of goods, áte. shall be and continue the same as they shall be for the time being, by the general course of the laws of England, until the said laws shall be altered by the said William Penn, his heirs or assigns; and by the freemen of the said province, their delegates or deputies, or the greater part of them.” — It is plain, that from the date of the charter until laws were made to’ alter the succession, lands descended according to the course of the common law; and not only descent, but enjoyment and purchase, including every other mode of acquisition, were governed by that law, — acquired and lost by the course of the same common law. In one word, in general, the common law has been in force in Pennsylvania, (1 Dall. 67:)jtnd"cohirAOn ré-TOVCTMMTay'a'fiart’of that C'omtrtOli'law.' ~ There was a day in this state, when thisT would ‘not have" been a popular doctrine with many. For some men, with very honest views, under the name of improvements were prepared for dilapidation: but the people, with the voice of the barons of old, exclaimed nolumus communem legem mutare. The provisions and institutions of the common lawaremore entitled to respect and veneration from their age and utility, better calculated to increase the happiness of individuals, secure their liberty and property, and promote the general welfare, the legitimate ends of all governments, than the institutions of any other country, with all. their boasted codes and codifications, so much applauded by some for their terseness and brevity. The true proposition is, that the common law is general and fundamental; and, unless where the common usage of the country has changed it, or it has been altered by acts of assembly, it is the inexhaustible fountain of justice from which we draw our law. It is sometimes asked with a sneer What is the common law of Pennsylvania ? I answer unhesitatingly, So much of the common law of England, and their civil institutions, as our ancestors brought with them, and of the statutes then in force altering or amending it; such of the more recent statutes as have been since adopted in practice, and the ancient usages,' may be considered as forming the body of the common law of Pennsylvania ; which has submitted to some alterations by'non-usage, by acts of the provincial and state legislatures, and by provisions of the constitution of the state and of the United States. — This definition has no claim to originality: it is collected from the judicial opinions of the courts throughout the union, and the express enactments of our own legislature, I mean the act of 1777, (one of the first acts of legislation of the state government,) which declares, “the common law, and. such parts of the statute-laws of England as have been theretofore in force, to be in as full force, as if they had then been enacted:” the act requiring the judges to report what British statutes are in force, and the act of March, 1810, prohibiting in courts of justice the reading or quoting of British precedents or adjudications, subsequent to the 4th of July, 1776, than which *359 nothing can be a stronger recognition of the general authority of the common law.
Our ancestors emigrated with sentiments hostile to restrictions on the transfers of land, and impressed with the mischiefs of entail. They struggled hard to ret them altogether free, and passed act after act, putting it in the power of tenant in tail to aliene as tenant in fee by a prescribed form of conveyance. We cannot suppose, that they peevishly or wantonly renounced the power of unbinding them altogether, because they would not be suffered to untie them, in their own way: which wras not finally accomplished, until the act of 1799. So much had the people set their hearts on this, that the convention who framed the constitution of 1776, enjoined it on future legislatives “ to regulate entails in such manner, as to prevent perpetuities.” The best account of the mischief of estates tail, and of the remedy of common recovery, is in the opinion of Baron Manwood, in Sir William Pelham’s Case, 2 Leon. 66. Tenant in tail,” he observed, “ might, by the common law, aliene his lands post prolem suscitatam, and now he hath an inheritance, and may do waste, but he was so restrained by the stat. of Westminister 2d, that all the realm and all the subjects in it, were inveigled thereby. Jointures of wives, leases, mortgages, and other securities, were defeated, by the death of tenant in tail, which was both against the common law, and againstall conscience. These matters coming to the knowledge of the justices, and the mischiefs thereupon following being very frequent, and it appearing that tenant in tail was a dangerous fellow, and that there was no safe dealing toith him, they considered with themselves, that lineal warranty and assets, and collateral warranty without assets, did bar the entail, Upon this consideration, they grounded the practices and usages of common recoveries, so as by that means, tenant in tail hath potestas alienandi.” Not again to turn to this case, the subject of forfeiture by tenant for life, suffering a common recovery, is fully treated, and the Baron gives many instances where such forfeiture arises. Tenant for life joins the mise upon the mere right: lessee for years being ousted,* brings an assize and recovers, accepting a fine of a stranger comme ceo, &c. all these are forfeitures. He answered the objection, that .the recovery being void by statute could not affect the tenant in tail thus. As to what hath been said of the forfeiture, and that the recovery should stand in force, until the death of the tenant for life, and in our case the tenant is alive, truly, if the law should be such, great mischief would follow. For jointresses having assurances to them, of great and stately houses, and of lands furnished with timber, and of great yearly value, might suffer such recoveries, and having plucked the fee out of the heirs, might commit waste, and should be dispunishable, which would be intolerable mischief, and so concluded that a recovery by tenant for life was a forfeiture. But it is said, there has been no usage of recovery at common law.. The very *360 act of 1749 proves the usage of this common law right and privilege proprio vigore and without the aid of any act of assembly, from 1713 to 1749. It declares prior common recoveries to be valid: but this was no^ acknowledgment that they required such aid. Provisions of this kind are frequently used.. They are introduced, ex majori cautela, and prove nothing here. Fines, though seldom if ever used, are still recognized. The judges in their report, introduce several British statutes, regulating fines, as obtaining in Pennsylvania; particularly, the statute de modo levandi fines. In conveyances, usage introduced a mere acknowlgement of a feme covert, and when this was questioned in courts of justice, it was confirmed on the principle of communis error facitjus. From 1744 to the passing of that act, there are found three eommon recoveries suffered in the city and county of Philadelphia. In the other counties, there has been no search. Whether there was, at that early day, in Chester, Bucks, or Lancaster counties, any lawyer sufficiently skilled to conduct them, I know not: but in the city and county, we find the only distinguished members of the bar, the .attorney general Mr. Francis, Messrs. John Boss, and Moland passing them. When we find such proceedings carried on by such men, and admitted of record, as judicial acts, by a court having jurisdiction in all actions, real, personal and mixed, it forms the only conclusive evidence such fact is capable of, irre-fragable evidence, whose verity cannot be questioned. For no man can deny, that defacto, these recoveries were suffered. How weak was the evidence of the use of trial per medietatem linguse proved by one witness to have been used in one instance, compared with the undeniable evidence by record? and if the validity of any one of these three recoveries, at the end of nearly eighty years, without the benefit of the protecting clause in the act of 1749, was now called in question, I would not be the judge to pronounce them all nullities, and that all these solemn acts, advised, conducted, and guided by all the respectable men of the profession, recorded and acted upon in courts of justice, the property transferred again and again, improved and built upon, and now of a hundred fold more value, were nothing but assumptions of power, co-ram non judice, and no title acquired under them. Higher , and better evidence could not exist. But in addition to all this, we have the declarations of Chief Justice M¿KeaN, and Judge Yeates, in Sander’s Lessee v. Morningstar, before referred to, that to unsettle so many titles held by them, would be productive of endless confusion. This was never called in question, until the decision in Dunwoodie v. Reed, unless in the statement of Chief Justice Shippen, and certainly every thing that fell from that venerated man, is entitled to great respect, and it is not to be wondered at, that confiding in this statement, as all would do, it would produce erroneous opinions. But the Chief Justice there showed, that either there was mistake in the statement, or misconception in the repor *361 ter, and this has been more abundantly proved on this argument. The usage in the courts of confessing a judgment against the testator, and selling his land to dock the entail, was an expedient resorted to, perhaps, by country practitioners from ignorance of the mode of cutting the Gordian knot by common recovery, and therefore cutting it by a sheriff’s sale. This silence on the exercise of so great an authority, in the use of a common law remedy, the only one which existed to cure the crying mischiefs of estates tail, is of itself powerful evidence of its legal foundation, though nothing can be found in any book respecting it; just as the total disuse of any institution for ages past, would afford just and reasonable objections against the enforcing superannuated ordinances. 1 Woodson, 63. This usage does’ not require the same strict evidence that is required to prove a particular custom in derogation of the common law, which is a general custom, but it has all the ingredients of a particular custom. It is immemorial, that is, one of the primitive usages of the province. Continued, peaceable, reasonable, certain, and consistent, semper usitata tmd pro-bata. It is not a sound position, that to establish the reception of any part of the common law, it must be proved when and where and on what occasion, and by whom it was adjudged. If I were asked, in what cases it was adjudged that a limitation to a man and his heirs gave him a fee simple, I should be as unable to answer as Lord Hale was, when the same question was put to him. Who before the decision of Eshleman v. Hoke, could point out a case in which it had been decided, that collateral warranty, with sufficient real assets descending to heirs, will bar them from recovering the lands warranted? Yet this was the opinion of the court, on a special verdict; not a hasty decision at Nisi Priics, but where time had been taken for deliberation. 2 Yeates, 504. 4 Dall. 168. But the proof of the negative should be on those who allege the exception, and it is susceptible of ready proof. For instance; to prove that in this state, the wife will be endowed of a trust,estate, the husband entitled to be tenant by the ciirtesy, though no actual seisin Oi the wife’s lands, if they be uncultivated lands. I know not whether it has gone to a case of actual adverse seisi.n: the constructive seisin of wild lands, not obtaining where there is an adverse possession. 8 Johns. 262. Where there is an adverse, seisin, in Connecticut it is held, that the wife’s right to possession will entitle him. 4 Day, 29S. Nor has the rule, that descents toll entries, or that one cannot grant or devise lands, where the seisin is adverse, sei-sin being necessary by the feudal law in order to the investiture of possession, being inconsistent with the state of a new country, been ever used here. Ownership gives the right of alienation.
The course of the offices, and a variety of precedents form strong evidence of the law; but here are the judicial opinions of Chief Justice M‘Keaw, Chief Justice Shipfen, .Justices Yeates and Bradford. Chief Justice M‘Kean, not only in Sander’s Lessee v. *362 Morningstar, but in M‘Kee v. Pfoutz, directly admits, that feudal ceremonies in relation to descents and transmissions of property, prevailed here. He says “ the legislature, has, at various, periods, and on a variety of subjects, departed from fuedal principles and ceremonies, in the descent and transmission of real property;”* clearly showing, that where the legislature had notdepart-ed from them, they continued the law of real property: and Judge Shippen admitted the feudal principle of forfeiture, by feoffment or deed of record. The weight of practice, of jurisdiction exercised, of the opinions of all the sages of the law, is not to be compared to the mere usage of conveyancers. Yet so much respect is paid to their practice, that courts of justice will not overturn the universal opinion and usage of eminent conveyancers,'though not founded in principle, as it might render titles precarious. Sugden, 288. In Basset v. Basset, 3 Atk. 298, the chancellor said, that the uniform opinions and practice of eminent conveyancers, has always had great regard paid to it, in courts of justice, and the case of Radnor v. Vandebender, Show. P. C. 69, was determined ore the point of dower, entirely from the opinion of conveyancers on the deed. The common law of common recoveries is the common law of Pennsylvania. Are contingent remainders acknowledged by our law ? For if they are, they must partake of. the destructible quality which their very name impresses on them. That such things are, was not denied in Dunwoodie y. Reed, and if they are, they must require .a particular estate to support them. They cannot live in the air, or be dandled in gremio legis, until they are ripe for enjoyment. They hold life by a most .attenuated thread. Take away this prop, and they drop into the grave, or rather, their potentiality of future existence is annihilated. Present existence they have none. They never were in rerum natura; and this prop may not only be removed by the forfeiture of tenant for life, but is subject to the accident of the consolidation of the two estates, for life and in fee, by merger, which may happen by act of the parties, surrender by tenant for life to him who holds the ultimate fee, either by way of remainder or reversion, or by act of law, mediate descent. For whoever and whatever avoids the first estate of freehold, avoids remainders expectant on this estate, whether it be by act of tenant for life, or act of law altering the particular estate in quantity of interest; for it is not the same estate', whatever may have produced the alteration. This imperfect and suspended state is one of the substantial differences between contingent and vested remainders, 2 Bl. 173; and this contingent remainder, with this mortal infirmity, was received as the common law of Pennsylvania, in Evan’s Lessee v. Davis; 1 Yeates, 332, where the only question made was, whether the remainder to Abel James, was vested, or contingent; for it was admitted by the counsel for the plaintiff, and for the defendant, that if the particular estate determined before the contingency happened, the contingent remainders were destroyed. The *363 counsel for the plaintiffs were E. Tilghman, Wilpocks and Lewis; for the defendant's, Sergeant, Ingersol!, and Coxe: of whom it maybe said without disparagement to their successors at the bar, that they were not excelled by them, in their knowledge of this branch of the law. Chief Justice M‘Kean, Justices Shippen, Yeates, and Bkad-EoitD, were all of this opinion. This case establishes incontestibly at least two points. One, that such things as contingent remainders are common to our laws; and another, that they are determined by the destruction of particular estates. It goes far to establish a third point, that common recoveries will produce this effect of forfeiture and determination of the life estate, on which a contingency depends. Judge Yeates decisively, the other judges by strong implication. Judge Yeates, observed, that “the only question was, whether the remainder to 'Abel James, was vested or contingent. The particular estate of John Pariock, being determined by his attainder, the contingent remainder is gone and the commonwealth should have the fee, discharged of all remainders;” and this on the principle, that the deed from the state to the purchaser operated as a common recovery. The state, like the king, could not suffer a recovery, for conveniency, decency, and order. The decision of the late President Wilson, in the case of Ratton v. Cornish, is directly in point, and though not binding on this court, yet it was the opinion of a judge who seldom took up hasty opinions, and whose legal knowledge, great discretion,' and sound judgment are held in high and deserved respect. But the multiplication of proof is extraordinary. The report of the judges on the English statutes in force, is conclusive, for it recommends the incorporation by act of the legislature of all the British acts of Parliament respecting common recoveries. Now most of these avoided collusive recoveries suffered by tenants for life, and if the effect of a common recovery by the common law by the act of tenant for life was adopted by the act of 1749, these acts would be nugatory, and without any subject to operate on. But when a moment is occupied in comparing the provisions of this act with a definition of • a recovery at the common law, there will be found such exact and literal conformity, as to satisfy the mind that the legislature, having this definition in their view, intended the common recovery in its height and length and breadth to be the same artificial thing with all its proportions and with all its vigour. By that act, a common recovery is to be suffered according to the course of the common law and statute laws of England, of lands entailed and shall have the same form and effect for barring estates tail. The argument is that this act forbids any other than'a tenant in tail from suffering a common recovery. So likewise do the British statutes, by declaring collusive and void common recoveries suffered by tenants for life. So, the common recovery, though it has the form of a suit at law, and the effect of a judgment at common law, yet the whole transaction is one common assurance, and the recovery is a creature *364 and instrument of the tenant in tail for whose benefit the recovery is suffered. In Taylor v. Horde, 1 Burr, 60, Lord Chief Justice Willes, justly says, that “Mr. Piggot has confounded himself and every one who reads his book, by endeavouring to give reasons for, and explain common recoveries; and whoever does so on any other principle than that they are common assurances, will run into absurdities.” Willes, 75. And in joage 451, the instrument is thus defined: “It is a conveyance on record, invented to give a tenant in tail an absolute power to dispose of his estate as if he were tenant in fee:” and Sir William-Blackstone, 2 Bl. Com. 361,definesacom~ mon recovery to be “a formal mode of conveyance, by which tenants in tail is enabled to allien his lands.”' This conveyance invented for-the sole purpose of docking estates tail, yet destroys the particular estate of a tenant for life, and is not like an innocent conveyance by bargain and sale, as in M‘Kee v. Pfoutz. And why is it, that common recovery forfeits the life estate? Because it is a solemn assurance of record,, and from its notoriety, is equal to a feoffment and an investiture coram pares. But what puts the forfeiture beyond doubt is, that James being vouched and disclaiming of record, he lost his estate for life. Coventry on Recoveries 54. And this may distinguish common recoveries from bargains and. sales as to the forfeiture, and tend to support the opinion of the Chief Justice as to the effect of a conveyance under the act of 1799. The reasonableness of the doctrine of forfeiture and rewarding tenant for life by giving him a fee is objected. This is confounding two things. Tenant for life, does not acquire the fee simple by his tortious act. He loses his life estate; he gains nothing. It is only where he has the revejsion, that, by the destruction of the contingent remainders he becomes a gainer. The forfeiture is a punishment on tenant for life for his disloyalty. The consequence is a different matter. There he is entitled to the reversion.
It is this that brings the doctrine to the test of common reason. A man makes a disposition of a remainder or füture interest, which is to take no effect until a future event or contingency happens. It is admitted; that no interest passes by such disposition to any body, before the event referred to takes place. The question is, what becomes of the intermediate reversionary interests from the time of making such future disposition until it takes effect. It was in the grantor or testator at the time of making it. It is confessedly not included in it. The natural conclusion is that it remains where it was, viz in the grantor or testator, and his heirs for want of being parted with to any body else. When the future disposition takes effect, then the reversionary or future interest passes, pursuant to the terms of it But if such future, disposition fails of effect, either by reason of the determination of the- particular estate, failure of the contingency, or otherwise, what is there then to draw the estate, which was the intended subjéct of it, out of the grantor or his heirs, —or the heirs of the testator — or who can derive title to an- estate *365 under a prospective disposition, which confessedly never takes any effect at all. Fearne, 364.
The reason of many rules of property has ceased, and yet the law remains. The rule in Shelly’s case, that unbinding and inflexible rule, as some suppose it, which bears down all before it, converting an estate for life into an estate tail, is of feudal origin, yet it continues a rule of property,, an unbroken pillar of the common law, not to be demolished or thrown by with the rubbish of the dark ages. Smith v. Chapman, 1 Hen. & Munf. 300, 3 Finn. 164. Findlay v. Riddle. It has been remarked by a very celebrated author, eminent for his great endowments in almost all sciences, and considered an able jurist, “ that nothing is law, that is not reason, is a maxim excellent in theory, but dangerous in practice. The reason of Titius may be different from that of Septimus. No man who is not a lawyer would ever know how to act, and no man who is a lawyer know in many instances what to advise, unless courts were bound by authority as firmly as thepaggn deities were supposed to be bound by the decrees of fate.” Jones on Bailments, 46. It is my wish and my comfort, said a very learned judge, “to stand super antiguas vias, to tread in paths, quae relictse sunt et iruditse. Those who arc confident in their superior abilities may, perhaps, fancy that they could erect a new system of laws, less objectionable than that under which they live. I have not that confidence in mine; and am satisfied by the decisions, and series of decisions of great and learned men, on the rules of law under which the landed property of this country is now held, and it is my duty, as well as inclination, to give effect to these rules. I cannot legislate, but by my industry, I can discover what our predecessors have done, and I will tread in their footsteps. ■ Authorities established, arc so many laws, and recoding them unsettles property. Established maxims as to the legal effect of the different modes of conveyances, will render the decisions of titles as little dependent as the nature of things.will admit of, on the occasional opinions, humour, ingenuity, or caprice of the judge, and are, therefore, the most proper and sure grounds to restand depend upon For the judgment being guided by fixed and known rules, will not be liable to the temporary influence which must necessarily have a share in directing the decisions of every court upon earth. No room can be left, to litigate on disputed titles, built on such a stable foundation. Titles so familiar, may be clearly and easily ascertained, and under them a permanent and pacific enjoyment may be inherited. Fearne on Cont. Rem. 170.
Insecurity of titles, as we have experienced in the controversy between the actual settlers and the warrantees, tends much more to clog the circulation of property, and impede the settlement and improvement of the country, than even obstruction's growing out of perpetuity. On what foundation does the whole doctrine of common recovery stand, which takes away the estate, that the sta- *366 tule de donis meant to be unalienable from the issue in tail ? On the ground of receiving a recompense ? On what ground of reason, the rme of collateral warranty, either with, or without assets descending on the heir, which stripped him of his estate, but some rigid rule of law ? These rules may sometimes press hard on individuals, yet are, notwithstanding, the laws of the land, and it is an answer to all this objection, to say, it a lexscripta est. Courts, says. Judge PatteRSOn, in the dischargeof thejudicial function have often occasion to exclaim durum, va de durum est, sed iia lex. Contingent remainders, liable to extinction by the determination of the estate on which they depend, and whose support they require, being received as a rule of law, it must continue to be so while the subject of it exists, until altered by some solemn act of legislation. It cannot remain unregulated, subject to judicial discretion, until' the legislature should malte a law respecting it. For this would open a door to all the uncertainty, confusion, and disorder, which laws are made to obviate and prevent. Fearne, 88. I, however, am free to confess, that my mind is not troubled with any compunctious visitings, and had I not been fettered with authority, I have no wish here, if wishes could be indulged, to give effect to the posthumous family7 pride of this testator. Nor do I think it any breach of duty in James and Jindrew Hamilton, to endeavour to come at the inheritance by any mode the law will allow of: and if the respectable testator was permitted to revisit this world, this property and its present state, and the present state of the family whom he intended to provide for, he would rejoice to find, there was discovered an expedient in the law to disappoint his vain design that his estate should not be inherited by any human being who breathed the same air with him, and defeat his proud view of aggrandizing some unknown son of an unknown ancestor, at the expense of all his living representatives. But the consideration has not weighed a feather in the construction I have given to the effects of a common recovery.- When at the bar 1 had fallen into errors; perhaps, led astray by the apparent unreasonableness of the rule, and confirmed in this error by the misapprehension of the principles on which M'Kee v. Pfoutz, was decided. For, at the time it was generally understood, that the same doctrine would apply to common recoveries, and this error was strengthened by the narrative ■ of Judge Shipper. ' From the very full discussion, for the arguments have certainly included every thing that could be said on both sides of the question, from the decisive evidence of the use of common recoveries at the common law before the act of 1749, and a conviction that the act of Í749, as well as the act of 1799, left their effect unimpaired, and on a patient investigation, after much reflection, I acknowledge my error, and am now as fully satisfied, that, a common recovery suffered by tenant for life, determines his estate By'forfeiture,'''an a destroys all contingent remainders"depen-dant on’that estate, as that á grant to a man and his heirs,' gives
L *367 him a fee simple; and I am as far from thinking that it is’quite so sure, that the rule was without good reason, as that the reason has ceased. The necessity under the feudal system, that there should be always some one ready to perform the lord’s services, was not the only reason which introduced the maxim of the common law, . that the freehold can never be placed in abej'ance. It had a better foundation which continues still to exist, and to exist in Pennsylvania, that there should be always some person to answer the real action, brought for the recovery of the property. Grants which would place the freehold in abeyance, or delay a suit, or after any short interval, cease the estate to one person, and then give it to another, and so a'terms vicibus, would be most pernicious. A person who lias a right of action, would in one case, dower, be defeated altogether, and in another case, partition, be greatly delayed,- and the policy of the rule which denies to the owner the power of putting the freehold in abeyance, is, in fact, effectually attained by the rules applicable to contingent remainders, by precluding them from effect, unless they vest in interest during a preceding estate of freehold, or in the same instant the particular estate determines. See 4 Preston on Estates, 254, 255. For if a freehold could pass to commence in futuro, there would be an abeyance, and want of a tenant against whom to bring a precipe, and the law will not suffer the land to be in abeyance a single day, if possible, to prevent this. For if it might be -without a tenant for one day, why not for fifty years? Vernon v. West, 2 Wils. 165, by Peatt, Chief Justice. There are several cases in which a real action will lie in Pennsylvania. Assise of nuisance is one. Livezey v. Gorgas, 2 Binn. 192: Quod permití at prosternere, was maintained at Nisi Prius at Chambersburg: A writ of waste, in which the place wasted is recovered; but the mischief is not so great for the want of a tenant, as the party might have other remedies. There are, however, two cases which would be without remedy, dower, and partition, as there would be no tenant of.the freehold, against whom to serve the writs, and they could not be against tenant at will, or for years. I know not of any direct decision as to dower in this state, but from the nature of the demand and recovery, it must be so, 2 El. 183. In Parker v. Murphey, 12 Mass. 415, it was decided, that a writ of dower lies only against him who is seised of an estate of freehold, or inheritance. The writ of dower unde nihil habet, is a writ of entry, which lies where the widow is deforced of all her dower. The. writ of' right of dower, is a more general remedy, extending either to part, or the whole, and is of the same nature as the grand writ of right. So that if dower were partially assigned, the widow’s only remedy is the writ of right. But it would be difficult to support any action of dower against the tenant for years, or at will: for if it could be, he would have judgment against him for the damages also, although from the nature of his estate he could not be supposed to have ex *368 pected any such liability, nor to have provided in any way for indemnity,against it. Damages in dower are given by statute of Merlon, and the reason why th!e jury are to find the value of the land, in case the husband died seised, is, that the court may give damages, pursuant to the statute, from the death of the husband to the time of the judgment, and if the heir sell to J. S., and the widow recover her dower against him, he must pay the whole mesne profits, from the death of her husband; although he has not been the half of the time in possession. Bull. Nisi Prius, 115, 6 Johns. 290. In Miller v. Beverly’s Widoio. 1 Henn. & Munf. 368, it was decided, that a writ of dower unde nihil habet, cannot be maintained against a tenant for years, but must be brought, against the tenant of the freehold. It lies only against the tenant of the freehold, F. N. B. 148. It is clear law, that partition will only lie against the tenant of the freehold. Bethel v. Lloyd, et al, 1 Dall. 2, and 1 Binney 1, Lit. Rep. 300. It was doubted, whether it could be supported by tenant of the curtesy. Walker v. Dilworth, 2 Dall. 257. But if the reason of the law has ceased, it is for the legislature to say the law shall cease, and Loid Chief Justice Piiatt, though he acknowledged this doctrine had little foundation now to rest oh, with emphasis said, “we must not overthrow the established principles of the law,” and he was no slavish adherent to antiquated notions, 2 Wils. 169.
I may state, as a matter of judicial history, that British Judges regret the existence of this rigid rule, aud that as they never will construe a devise to be executory, when they can construe it a contingent remainder, so, if there is any thing in the conveyance or will, by which it can be supported as a vested remainder, they will never consider it contingent. And although equity cannot interpose where there is no trust, yet it views the destruction of contingent remainders in the light of a wrong or tort, and makes every possible effort to extend its protection against them. It is said, that Lord Kenyon had prepared a bill for the House of Peers, but withdrew it on some preliminary objections, in a fit of vexation. But this «|id not rudely remove a key-stone in the arch of the Gothic edifice.. It filled up the vacuum, and preserved the symmetry, by converting the tenant for life into a trustee to support the remainders, eo instanti, he destroyed the particular estate. And there could be nothing more simple than this pfan. But this is matter for legislative enactment, not for judicial decision. The present, chancellor seems to doubt, whether a Court of Equity would compel a purchaser to accept of a title depending on the destruction of a contingent remainder. But the law continues the same, that if a tenant for life, contingent remainders to his first and other sons, destroys 'the'contingent' remainders, that is no breach of trust, and equity, will not interpose. Fearne on Cont. Rem. 315. For in Mansell v. Mansell, 2 P. Wms. 678, it was resolved, by the chancellor, with the concurrence, of Lord Chief Justice Ray- *369 MOND, and Chief Baron Reynolds, that where an estate is limited to A. for life, remainder to his first, and all his other sons in tail, though it be .a plain tort and wrong in him to destroy the contingent remainders before the birth of a son, notwithstanding he has legal power so to do, yet, as in this case, he is no trustee, and there • fore, no trust. There can be no breach of trust consequently, and therefore, a Court of Equity may have no cognizancen or handle for relief, the matter being left purely to the common law. But to prevent this inconvenience, a remedy has been invented of appointing trustees, on purpose to disable the tenant for life from doing such injury to his issue, which is not a very old invention. This solemn resolution which has been received and considered as the approved doctrine of the law, is decisive. If it is so, as it most certainly is, the effect of a common recovery by tenant for life in England to destroy a contingent remainder depending on ‘hisjjar-tictlltrf'estafej"'anrnra common' recovery suffered since the act of T74'97'ft~ásThe same effect as a common recovery in England, as I now am of opinion it has, (I speak with great deference to Judge Gibson, who holds a different opinion,) it follows, that the plaintiffs in the case stated, are entitled to judgment.
In coming to this conclusion, it has had its due weight with me, without, I trust, producing an improper influence or unfair bias so as to blind my own understanding or deceive my judgment, that those proceedings were-advised and conducted by two gentlemen of great professional knowledge; and the purchase by the Bush Hill company was made on the strength of their legal opinions. — Of the survivor, and in his presence, without offence to his delicacy and the imputation of flattery, I cannot say how highly I prize his legal opinions; but I may speak of the dead with greater freedom; . — of the late Mr. Edward Tilghman, whom it gives me pride and pleasure to say I knew long and knew well, and from whom, in my early professional concerns, I received much useful instruction. — His attention to young men in the profession, was one among the many honourable traits that distinguished him at the baf. Of him I can truly say, that I never knew any man who had this intricate branch of the law so much at his finger’s end. With all others, with whom -I have had professional intercourse, it was the work of time and consideration to comprehend; but he took in, with one glance, all the beauties of the most obscure and difficult limitations. With him it was intuitive, and he could untie the knots of a contingent remainder or executory devise, as familiarly as he could his garter; and his name adds, with me, some sanction to those proceedings.
The usage'of eminent conveyancers has settled the forms and construction of conveyances. At an early day, they wére fixed by Bridgman, Palmer, and other distinguished men. In latter days, conveyancing has become a peculiar province, and an important department of the law; and there have appeared many great men in *370 that branch; Booth, Feqrne, Hargrave, Preston, and others, by whose opinion and advice the landed property in England has been glided, either in alienations or family settlements. Their usages, though they do not snake the law, are strong evidence of it, and respected in courts of justice; and though they may not agree with them in principle, yet they will not disturb or unsettle property by changing this usage.
I have employed much of m'y own time and reflection to understand the question; and all my humble faculties to give to this important cause, a decision consistent with the laws of the land; and I feel I have trespassed too long on the public time and patience. But the occasion seemed to me to call for a full explanation of the reasons of my present opinion, so different from the opinion it was well known I entertained, and often publicly expressed. And the wide field necessarily opened by counsel, on the whole doctrine of the common law, as applied to our tenures, and the various topics that naturally crowd on the mind in considering it, have extended my observations far beyond my original intentions; which were, to deliver my sentiments with precision and as succinctly as possible. In the latter view, perhaps in. both, I have failed, I come now to consider other views which have been taken of this case, on the second argument. It is contended by the counsel of the defendant, that admitting a common recovery to have the same consequences that as in England, this common recovery could not produce a forfeiture of James’s life estate: it would be innocent, and would bar the tenant’s estate in James, leaving undisturbed all the intermediate estates.
I proceed to this inquiry, unconnected with other considerations and other doctrines, which will be hereafter alluded to. James the second, would be tenant for life in possession, contingent remainder to his first and other sons in succession for life; and to his sons in succession in tail male; and so to Andrew the second, and his sons, &c., with remainder in tail general to James, with remainder in interest, but not in possession, in default of all such issue remainder or reversion to the right heirs of testator. The reason why the tenant for life forfeits his estate is, because it is considered as a proper punishment for attempting an act inconsistent with his tenure, and calculated to injure those in remainder. But the law will never punish a man for doing that which is consistent with the nature of his estate, and may have a legal operation. Here James stood in two characters; he was tenant for life, remainder in tail in 'esse. This remainder in tail to himself, being tenant for life in possession, he might legally bar: * Hé'Hás hot taken on him to do "anyact inconsistent'with thenature of his 'estate; the tériaritto the'proscly>é'beihgmade by bargain and sale. Fearne, 322. Coventry on Recoveries, 136. My opinion is, that the recovery, even if Andrew had not been vouchee, would not have been a forfeiture of James’s life estate.
*371 It is clear, that Andrew, by being vouchee and entering into the // warranty, determined his life estate; whether by forfeiture, estop-/ pel, or cession to James, by the deed to lead the uses and recovery,1 can make no difference. There then remained in no one any particular estate of freehold to support the contingent remainders. Andrew had no estate which he could enlarge. It is immaterial, whether he was a necessary party to the recovery or not. If he was not, it was a disloyal intermeddling on his part. But he avowed himself to be a necessary party on the record, by entering into the warranty; and this would create a forfeiture, though he did not enlarge his own estate. The proceedings in a common recovery are considered to be in reality what they purport to be, a real action between real parties. Andrew appeared as a party in this real action, challenged the fee in a Court of record, warranted his title to the fee. Now a tenant for life may forfeit his estate in four manner of ways: by matter of record, by alienation by feoffment, by claiming a greater estate than he ought, and by affirming the remainder or reversion to be in a stranger. By claim; as if tenant for life, will, in a Court of record, claim a fee, implied; as if in a writ of right, he will take upon him to join the mise upon the mere right, and which none but tenant in fee simple ought to do. So, if a tenant for years bring a prcecipe and lose, and then bring a writ of error, this is a forfeiture. Co. Lit. 257. If a tenant for life claim a fee, this is a forfeiture. So, if he challengoth, in a Court of record, a greater estate than he hath. See Pelham’s case, 2 Leo, 66. For the bare attempt to do a wrongful act or unlawful thing, . though void, creates a forfeiture. Parkhurst v. Dormer, Wittes, 343. The question is, could Andrew eater on James’s death ? was he not estopped ? Estoppels are of three kinds: matter of record, in writing, or act in pais. The acceptance of rent is of the last sort. The estoppel by record is founded on this, that what a man hath once solemnly alleged, he shall not be suffered to contradict. Anderson’s Appeal, 4 Yeates, 38. If the recovery was a real proceeding, no one could doubt the estoppel.. Substantially, it is a real suit. If not a real suit, it is nothing. It is a real suit, a writ against the tenant, who must be tenant of the freehold— appearance of the tenant — a count against the tenant — voucher of the party who conveys to the tenant — vouchor over — judgment ultimately recovered by the demandant, and recompense in value from the last vouchee. If this was a real, adverse proceeding, unquestionably Andrew’s estate, whatever it was, was gone, and a recompense in valúe recovered by him from the last vouchee. In an adverse suit, Andrew could not falsify the record, as every man is bound by every material admission he makes on record. This estop-pel precludes Andrew and all claiming under him- from gainsáyiñg the'fact, that he has lost his estate, and recovered the valué of if from the last vouchee. There was no occasion for an actual entry. This is only necessary to avoid a fine, or the statute of limitations. *372 But if an actual entry were necessary, James, when he conveyed to the defendant by his attorney, was in the actual possession. The benefit of estoppel will enure to the use of the party to whom the right might have been released, or as if the recovery had been a release, and the party in possession may take advantage of it, to conclude the party suffering it, from claiming the land, contrary to his own act. 3 Co. 55. Coventry on Recoveries, 195. From whatever cause, by whatever means, Jlndrew'1s estate was extinguished, the right of entry and the possession were, on its determination, both in James, as well as the title in fee simple. Remainders must always take effect in regular order and succession, according to the order in which they are limited, and without any interval, and no remainder can take effect in possesssion otherwise than on the regular determination of ;he estate by which it is preceded. Preston on Estates, 119, 384.
The person who is the testator’s heir at law will have the reversion of the estates, until the fee, when limited in contingency, shall vest in interest, Fearne, 373. And where the devisee of the fee is in such case the testator’s heir at law, the fee must descend, and such heir at law take by descent. Carter v. Barnadiston, 1 P. Wms. 513. For in all such cases, where the devisee is heir at law' of the testator, he is heir of the reversion undisposed of, just as if the testator had died intestate. Slifer v. Beates, decided the last term in this court. The reversionary interest descended to JLndrew, the first, not as a purchaser or person described, but in the quality and character of heir, and on his death descended to his heir. For this reversion, though after an estate tail, was still an estate in him. Preston on Estates, 316. This consideration will be of importance in a further inquiry. We see the necessity of a double vouchee: of Jlndrew being brought in as vouchee, and the reason why James conveyed to Jlndrew one third of the fee. It is the effect of a common recovery with a double voucher, to bar the first vouchee and his heirs, of such estate as was, at any time, in him, and all others of such right in. remainder or reversion, as was at any time dependent and expectant on the same. Pigott, Recov. 1. A contingent remainder cannot be passed or transferred at law before the contingency happens; otherwise than by way of estoppel or fine, or by common recovery, where the person entitled to the particular estate comes in as a vouchee.
The doctrine of estoppel is thus applied to Jlndrew’s life estate. The particular estate which on the regular determination of James’s freehold estate in possession, was to succeed it, and support the ¡contingent remainders, Jlndrew, by being vouched, was incapable 'of taking at James’s death, and the contingency on which it was [to arrive, not having happened, the right of entry was in James, ■whose estate entail was changed into a fee. . For he was the only 'person in whom the whole reversionary fee simple vested. It is admitted, nay contended for by the defendants, that James acquired *373 nothing by the recovery, but what he might legally do. He then legally acquired Andrew’s life estate, and the recovery was innocent. What follows? It follows, that James then held the life estate of Andrew. For Andrew never could falsify the recovery, nor deny the operation of the deed to lead the uses, to which he was a party, and against whom, in contemplation of law, there was a recovery in a real action, and he recovered over -from the common vouchee, full recompense in value for all he lost. But this was a recovery with treble voucher, and the recovery with treble voucher is to make a perpetual bar of the estate whereof the tenant was seised, and of every such estate of inheritance, as at any time, had been in the first or second vouchee, or the ancestor whose heirs they are, as well as of every reversion then depending, as also of all estates, classes, incumbrances, and leases, derived out of any reversion or remainder. Pigott, 2. Andrew had an estate for life, derived out of the remainder, which thereby became perpetually barred. A common recovery does not only bar the issue’s remainders and reversions',' but'estops all parties, and therefore if tenant in dower, or a- jointress join in a common recovery, she is barred. Pigott, 123. All are barred by a common recovery that cannot falsify, lb. 124. In the famous case of Pells and Brown, the Magna Charla of executory devises, Cro. Jac. 592, it was held, that a devise to A: and his heirs; and if he die without issue in the lifetime of C., then to C. and his heirs; if A. enter and sufferacom-mon recovery, without vouching C., C. is not barred, because no recovery in value extended thereto, unless he had been a party by way of voucher, and then it. should. For by entering into the warranty, he gave all his possibility, and, therefore, the court agreed, to the case which was cited by Davenport at the bar, to be judged, 34 Eliz., where a mortgagee suffers a recovery, it shall not bind the mortgagor. But if he had been party by way of voucher, it had been otherwise; James could not bar the intermediate vest-i ed life estate of Andrew: \iot as Andrew came in by way of voucher by entering into the_ warranty, be passed all his.possibility to. him. If James only enlarged his own estate into afee, and gained nothing from Andrew, it must*be because the recovery as-to Andrew's life estate was tortious. If tortious, ■ then both the particular estates of James and Andrew are forfeited. If not tortious, then James acquired Andrew's life estate, he had then all the vested fi’eeholds united with the fee simple, acquired by the recovery enlarging his estate tail into a fee simple. There was then nothing to support the contingent remainders, this consolidation merging all the particular estates. So that whether the act of James was tortious or innocent, the contingent estates are gone. The perpetuity of ownership enabled the testator to make as many limited estates as he pleased, subject only to be defeated by a person who has the estate tail in possession, or by the owner of a remote estate tail, when he prevails on the tenant of the immediate freehold to *374 join with him in the recovery. 1 Preston on Estates, 118. By the recovery James acquired the ultimate fee. Then, as is said by Lord Chief Justice Hale in Purefery v. Rogers, 2 Saund. 386, his particular estate merged in- the reversion, and the contingent remainder is gone, though there be no divesting of any estate. And he puts this very case: A., tenant for life, remainder in tail in contingency, remainder in tail, in esse, and the tenant for life, and he in remainder in tail in esse levy afine: this is no discontinuance, or vesting of any estate, and yet the remainder is gone.
But there is another view of the subject, without considering the effect-of the recovery, that, in my mind, is equally conclusive.
The counsel forthe defendant, with much earnestness and ability, well knowing its importance to have it so considered, contended, that in default of all such issue, was not a limitation to the right heir of the testator, but a contingent remainder to the heir, at thetime of failure of issue, as a purchaser. He has failed to convince me of this. For in default of such issue, is, indefinite failure of issue, including all issue ad inñnitum. The intention of the testator is plain. The estate was to be preserved in the family of his nephews, so long as there were any issue of them remaining, and the limitations over to the right heirs of the testator, was not to take, effect, until their indefinite failure of issue. The ultimate fee remained in his heirs until the contingency took place, which vested the inheritance. It has no relation to the. doctrine of possessio fratis: for there, there must be an actual seisin. In cases of executory devises, as in Goodright v. Searle, 2 Wils. 29, there can be no merger. Where afee simple is first devised, and on that another fee, the second can have no existence until the event is to take placej on which the substituted fee is to arise. Not like the case of reversion, because the testator has nothing to vest. It was impossible for it to merge before it had an existence. If it could be extinguished by merger, it must be by its union with a greater estate, out of which it is to-be considered as a part, or, at least, an extraction. But how can two estates so unite, or one become blended with, or absorbed in another, when both are of equal measures, viz. both fee simple: and of which the one cannot commence an existence at all, but in the. event which destroyed and annihilated the other. Fearne, 561. But this is quite different. It is a case of a limited estate and a reversionary fee, consisting in the same person, and in such case, an estate for life, or a fee simple conditional at the common law, and the reversionary interest of the party who granted it, vesting in the samé person, creates a merger. A fee simple is the largest estate which a person can have, and may be divided into different parts, consisting of particular estates; and when the limited or conditional estates unite again in the same person, they form again one entire estate. Merger applies uniformly to estate, and takes place independently of any intention of the party, as often as two estates carved out of the same fee, unite in the sam,e person, one of which *375 is larger than the other, which receives it, and that one must always be a remainder, and there can be no remainder after a fee simple, and therefore, no merger. But here there were two intermediate estates for life, united in James, which unite as both the estates of James and Andrew did with the fee in James. These estates became absorbed in the fee simple. But James by the recovery, acquired an absolute fee simple, subject to the intermediate contingent estates, and there could not. be an absolute and a qualified fee in the same person. Tregonwell v. Strachan, 5 T. R. 107. In the notes delivered, 16, Geo. 3. For the common recovery passes not a bare fee. The reversion does not take place as if tenant in tail had died' without issue, but passes a full, ábsolute, unlimited, and rightful fee, and passes the fee in the same manner as the fee is passed by a feoffment of tenant in fee. Where there are two successive fees, the second is not the old reversion, waiting on the limited fee, and constantly in esse whilst that limited fee continues, but is a new fee which never will be in esse, until the limited fee ceases: and no act done by the owner of the limited fee, during its continuance, will enable the person who has the chance of the second fee, to interfere with him. But here, all the estates were concurrent, not successive, or shifting, and this distinguishes the cases. Consider this as if no recovery had been suffered. The reversion descended to Andrew, the nephew, the sole heir of the testator. He took it by descent, as if undisposed of by .the will. He died in the life time of William. The fee then descended to all the children of JLndrew, James, the eldest, taking two shares, as our intestate laws then stood. The particular estates and the reversion remained separated, until the death of William: they then, for the first time, united in the person of James. He was the tenant for life, with contingent remainder to his eldest, and all his sons in succession, and the sons in tail male, remainder to And,rezo for life, with contingent remainder to the sons of Andrew, in like manner, with remainder to James in tail general, and remainder in fee to him, by descent from his father. If the whole estate had descended to him in fee, as sole heir, as it would at the common law, there could be no question, by this consolidation of estate, but that the estate for life in James was merged by the estate of inheritance upon him, and this is Kent v. Hartpool. T. Jones, 76. 1 Vent. 306, and Hooke v. Hooke. Hardw. Cas. 13. In the last case lands were conveyed to the use of A. and his wife, remainder to the use of B., son of A. for life, remainder to the first and other sons óf A. in tail, remainder to his daughter in tail, remainder to A.in fee. A. and his wife died, in the life time of B., who afterwards died without issue. The question was, whether the wife of B. was entitled to dower in the lands, and it was decided, that she was; because the estate for life of B. was merged by the descent of the inheritance upon him, and the contingent remainders destroyed. Here if James had died after the death of Andrew and William, his wife would have been dowa- *376 ble; and Mr. Fearne, (Fearne, 343, 34.) shews the reason. To be sure, it would be incompatible with reason, that if James had taken the life estate and the fee simple both from the testator, that they should immediately merge the particular estate; that it should be destroyed at the same moment, and by the same instrument which created it. In that case, the will would be ipso facto void. But where,the accession of the inheritance is by a conveyance, accident, or circumstance, distinct from that which created the particular estate, as there, there could be no such suicidal conjunction: for both estates took effect, the particular estate, and the general fee, and having the capacity to take effect, they are not af-terwards exempt from the operation of merger by descent. But the difficulty arises from James not taking the whole estate from his father, and this is not a consolidation of the entire estate, and, therefore, only a partial merger. I own it is a new question, not now necessarily calling for decision, yet as I am at present impressed, it does appear to me to produce the effect of a general merger. The doctrine is, that an alteration of the quantity, though not of the quality of the particular estate destroys it. • It is not the identical thing; the same crutch for the contingent remainder to lean upon. It cannot be lopped, or split into parts, and still bear the weight of the whole contingent estates. For it was necessary, that there must be a reversion of the.entire estate, to produce a merger. It would follow, that if tenant for life conveyed by feoffment all but one inch of the particular estate, that inch would support the whole ‘remainders. It is a curious speculation. Fearne, 338, states the broad proposition, that any alteration in the quantity of the particular estate will destroy the whole contingent remainder, though an alteration of the quality would not. But the recovery by James renders this all mere speculation. For by that he acquired the fee simple in the whole. There was then no continuing life estate in esse to support these remainders. They were in nubibus, and never could be called into existence, when the event took place which would give them life. No matter how this was produced, whether by forfeiture, estoppel, consolidation, or merger. And it is fully clear to me, that even a conveyance by bargain and sale, if there had been no common recovery, in which James and Jin'drew united, as here they did, would vest the fee simple in the purchaser. As if A. be tenant for life, remainder to his sons successively, in tail male, remainder to B. in fee, and if, before the birth of a son, A. convey to B., or A. and B. join in a conveyance to C. by bargain and sale, lease and release, the contingent remainders to the sons are destroyed. So where the estate is limited to A. for life, either in possession or remainder, with remainder to his sons in tail, with remainder and reversion to A. in fee; if before the birth of a son, A. executes a conveyance by lease and release, or bargain and sale inrplled, his estate for life, and remainder and reversion in fee become united, and the. remainders to the sons destroyed. *377 Fearne, 321. The distinction is, where the descent of the inheritance is immediate from the test-tor; there it does not merge the the particular estate. But where it does not descend immediately from the ancestor who granted the particular estate, but mediately, the contingent remainders are destroyed. Fearne, 341. Here James took the life estate from the testator, but the general estate, the fee, descended to him from his own ancestor, Andrew the first. There are many other questions arising from this will, the recovery, and subsequent acts of James and Andrew, and other events in the family, which present themselves. But the transaction is so fruitful of curious questions, that it is time to stop, as I am of opinion, for the reasons I have stated, that Samuel Richards, the defendant, has a good title in fee, conveyed to him of the premises, out of which this ground rent is to issue; and, therefore, that judgment should be entered for the plaintiff.
Judgment affirmed.